[No. G040995. Fourth Dist., Div. Three. June 11, 2009.]

GILBERT STREET DEVELOPERS, LLC, et al., Plaintiffs and Appellants,
v.
LA QUINTA HOMES, LLC, Defendant and Respondent.

## Counsel

Cox, Castle & Nicholson, Susan S. Davis, Edward F. Quigley and Alicia N. Vaz for Plaintiffs and Appellants.

Rus, Miliband & Smith, Ronald Rus, Leo J. Presiado and M. Peter Crinella for Defendant and Respondent.

OPINION

**SILLS, P. J.**—In this case we hold that a contract which contains the mere possibility that American Arbitration Association rules might one day in the future provide that arbitrators would have the power to decide their own jurisdiction does *not* "clearly and unmistakably" provide that arbitrators will determine their own jurisdiction.

## I. BACKGROUND

In July 1998, Tone Yee Investments and La Quinta Homes, LLC, formed Gilbert Street Developers, LLC, in order to acquire and develop certain property on Gilbert Street in Garden Grove. A third entity, Prince Properties, also controlled by Yee, became a member of the company in February 1999. The operating agreement had an arbitration clause that provided for arbitration of all disputes arising out of or related to the agreement, the arbitration to be "conducted in accordance with the Rules of the American Arbitration Association existing at the date thereof." However, there was an express exception in the arbitration clause for "matters which are expressly within the discretion of the Members."[1]

At the time the agreement was signed in 1998, and at the time Prince Properties became a member in 1999, the American Arbitration Association had no rule providing that arbitrators had jurisdiction to rule on their own

---

[1] Here is the complete text of the agreement's arbitration clause: "Any controversy or dispute arising out of or relating to this agreement or the breach thereof (exclusive of matters which are expressly within the discretion of the Members) shall be settled by binding arbitration. Such arbitration shall be effected by arbitrators selected as hereinafter provided and shall be conducted in accordance with the Rules of the American Arbitration Association existing at the date thereof. The dispute shall be submitted to three arbitrators, one arbitrator being selected by each of the Members involved in the dispute and the third being selected by the two arbitrators so selected. In the event that any Member, within 10 (ten) days after any notification of any demand for arbitration hereunder, shall not have selected its arbitrator and give notice thereof to the other, such arbitrator shall be selected by the American Arbitration Association. Judgment may be entered on any decision rendered in any Federal or State court having jurisdiction. Each Member shall bear the costs of the fees and expenses of the arbitrator selected by or for it, and the fees and expenses of the third arbitrator shall be borne by the Member demanding arbitration. Any such arbitration must be completed within 45 days following any demand for arbitration."

Readers should note that, while the clause provides that each member will pay for its own arbitrator and the member demanding arbitration pays for the third arbitrator, the issue of whether the clause unconscionably requires a party to bear burdensome forum costs (see generally *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 110 [99 Cal.Rptr.2d 745, 6 P.3d 669] ["we conclude the imposition of substantial forum fees is contrary to public policy"]) has not been briefed, and is not before us. We express no opinion on that point, and this opinion should not be read as any sort of approval of the cost aspects of this clause.

jurisdiction. However, in September 2000, the American Arbitration Association adopted a new rule, R-8(a), that provided arbitrators could rule on their own jurisdiction.[2] (Readers of opinions do not need another acronym to learn, but since "AAA" is often used for the American Arbitration Association, we will occasionally refer to the association as the AAA.)

The operating agreement also had a buyout clause. We will discuss and quote the buyout clause in detail in part II.B. of this opinion. For the moment suffice to say that if the clause were invoked by one of the members of the company, it would mean the invoking member would either buy out another member's interest, or have its interest bought out by another member.

Roughly 10 years after the formation of the company, in early 2008, a dispute arose between the Yee parties and La Quinta in regard to an offer to purchase the Gilbert Street property for some $13.3 million. The Yee parties liked the idea. La Quinta didn't. The Yee parties invoked the buyout clause, and thereafter scheduled an arbitration for May 2008.

Let us stop here for a moment so that last fact does not glide by: While there was, of course, due notice, the Yee parties simply went ahead and held an arbitration *without first* filing a petition to *compel* arbitration under section 1281.2 of the Code of Civil Procedure.[3]

La Quinta objected, by letter, both to (1) having the dispute arbitrated in the first place, since La Quinta contended that the buyout clause was a matter within the "discretion" of the respective members, and (2) having arbitrators decide their own jurisdiction.

An arbitration was held at the end of May 2008, with the arbitrators noting that La Quinta did not appear. The Yee parties swept the field. In an award signed in early June 2008, the arbitrators first held that, yes indeed, they had jurisdiction even though the provision in the AAA rules giving them jurisdiction to decide their jurisdiction did not exist in 1998. The arbitrators said

---

[2] See *Hasbro, Inc. v. Amron* (E.D.Pa. 2006) 419 F.Supp.2d 678, 685 ("Rule 8 of these rules provides that arbitrators 'shall have the power to rule on . . . jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.' American Arbitration Association Rules and Procedures, Commercial Arbitration Rules, as amended, effective September 1, 2000, Rule 8.").

Our own recent citecheck of the American Arbitration Association commercial arbitration rules indicates that the jurisdictional provision is now in rule 7.

[3] All further statutory references are to that code.

(a) the idea was "implicit" in the language of AAA rule 43 in 1998,[4] and (b) in any event, AAA rule 1, which *was* in effect in 1998, contemplated future amendment of the rules.[5]

Turning to the merits, the arbitrators held these things: (1) The company owed Tone Yee more than $29 million; (2) the Yee parties had properly invoked the buyout agreement; (3) La Quinta "no longer has a membership interest" in the company; (4) the company could go ahead and sell the property; (5) $13.3 million was a fair price for the Gilbert Street property; (6) La Quinta was entitled to zero from the sale of the property; and (7) La Quinta had to sign whatever documents necessary to both relinquish its interest in the company and effectuate the sale of the property.

By the end of June 2008, the Yee parties had filed a petition for an order *confirming* the arbitration award. The trial court, however, rejected the petition. Noting that the AAA rules were "silent" back in 1998 on the question of whether arbitrators could decide their own jurisdiction, in August 2008 the trial court held that "the possibility of a change in the Rules is not sufficient to show a clear and unmistakable intent by the parties that the arbitrator would decide issues of arbitrability at the time the agreement was entered." That is, the arbitrators had no jurisdiction to decide their jurisdiction.

Then, turning to the issue of whether the dispute concerning the buyout clause was indeed arbitrable, the trial court handed the Yee parties a second defeat. The court held that the buy-sell procedure is discretionary and "not subject to the arbitration agreement." The Yee parties timely appealed from the judgment denying the petition to confirm the arbitration award and vacating the arbitration award.[6]

---

[4] Here is the exact language of rule 43 as quoted in the arbitration award: "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."

[5] Here is the exact language of rule 1 as quoted in the arbitration award: "These rules and any amendment of them shall apply in the form obtained at the time the demand for arbitration or submission agreement is received by the AAA."

[6] Judge Frederick P. Horn wrote the minute order denying the petition to confirm the arbitration award. The actual judgment embodying that order and including a vacation of the arbitration award was signed by Judge Gregory Munoz.

## II. DISCUSSION

### A. Did the Parties Clearly and Unmistakably Agee That Arbitrators Would Have Jurisdiction to Decide Their Own Jurisdiction? No.

#### 1. *The "Clear and Unmistakable" Rule*

■ California common law is settled that parties to an arbitration contract must clearly and unmistakably agree that arbitrators will have power to decide their own jurisdiction; otherwise the question of whether arbitrators have jurisdiction is for the court. (*United Public Employees v. City and County of San Francisco* (1997) 53 Cal.App.4th 1021, 1026 [62 Cal.Rptr.2d 440] ["Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. The court also determines what issues are subject to arbitration."]; *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 652–653 [35 Cal.Rptr.2d 800] [" 'Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.' "]; *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 552 [21 Cal.Rptr.3d 322] (*Dream Theater*) ["the question of arbitrability is for judicial determination '[u]nless the parties clearly and unmistakably provide otherwise' "]; *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 893–894 [71 Cal.Rptr.3d 854] ["we conclude the arbitration agreement did not 'clearly and unmistakably' reserve to the arbitrator the issue of whether the arbitration agreement was enforceable"]; *Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 10 [92 Cal.Rptr.3d 249] ["Generally, the court must determine whether a dispute is subject to contractual arbitration, unless the parties clearly and unmistakably agree otherwise."].)

The California appellate courts in that last string cite imported the rule either from each other, or from a United States Supreme Court decision, *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 648–649 [89 L.Ed.2d 648, 106 S.Ct. 1415] (*AT&T*), or both. It is helpful, for our discussion, to review *AT&T*.

The court reasoned this way: Arbitration exists as a matter of contract, thus a party cannot be compelled into arbitration without agreeing to it in the first place. The default position on who decides arbitrability is "undeniably" a matter for judges, not arbitrators, so the parties must "clearly and unmistakably provide otherwise" if they want arbitrators to assume the role that judges would be normally expected to assume.[7]

*AT&T*, in turn, appears to have derived the "clear and unmistakable" rule from a line of federal Supreme Court cases that themselves traced their lineage back to a passage in a footnote in *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574 [4 L.Ed.2d 1409, 80 S.Ct. 1347] (*Warrior & Gulf*), the point of which was, similarly, that the *normal* situation is that *courts* decide arbitrability; a party seeking to upset normal expectations must therefore make a "clear demonstration" to the contrary. (*Id.* at pp. 582–583, fn. 7.)[8]

Despite *AT&T*'s small deviation from the "clear demonstration" formula in *Warrior & Gulf*, the "clearly and unmistakably provide" language stuck; indeed, the rule took on some added potency in the wake of Justice Breyer's opinion for a unanimous court in *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938 [131 L.Ed.2d 985, 115 S.Ct. 1920] (*First Options*).

■ The *First Options* case is a relatively extended disquisition on the topic of arbitrators having jurisdiction to decide their own jurisdiction. *First Options* specifically *contrasted* (a) "ordinary state-law principles that govern the formation of contracts" with (b) the clear and unmistakable rule, which the *First Options* court described as an "important qualification" in deciding the question of whether arbitrators have power to decide their own power. (*First Options, supra,* 514 U.S. at p. 944.) That is, it is not enough that ordinary rules of contract interpretation simply yield the result that arbitrators

---

[7] Here is the relevant text from *AT&T*: "The first principle . . . is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' [Citations.] This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. [Citations.] [¶] The second rule, which follows inexorably from the first, is that the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. [Citations.]" (*AT&T, supra,* 475 U.S. at pp. 648–649.)

[8] Here is the text of that footnote: "It is clear that under both the agreement in this case and that involved in [*Steelworkers v. American Mfg. Co.* (1963) 363 U.S. 564 [4 L.Ed.2d 1403, 80 S.Ct. 1343]], the question of arbitrability is for the courts to decide. Cf. Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1508–1509. Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose."

have power to decide their own jurisdiction. Rather, the result must be clear and unmistakable, because the law is solicitous of the parties actually *focusing* on the issue. Hence silence or ambiguity is not enough. We quote the relevant passage in a footnote, and readers should take note of the *First Option* court's use of language that indicates the desideratum that parties actually *think* about the idea of replacing the judge with an arbitrator as far as the threshold issue of arbitrability is concerned.[9]

## 2. *The Problem of Incorporation by Reference*

### a. What Is Incorporated Must Be Known or Easily Available at the Time of Incorporation

Establishing the "clear and unmistakable rule" is easy. The hard part is applying it. Just how "clear and unmistakable" must the parties be if they choose to have an arbitrator decide his or her own jurisdiction? An easy case is obviously when there is explicit language in the actual signed document to that effect. For example: "We want the arbitrators selected pursuant to this contract to have the power to decide whether what is put before them is actually arbitrable under this contract." But life is rarely that easy. When lawyers have the prescience to write clauses like that, their contracts usually

---

[9] "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts. [Citations.] . . .

"This Court, however, has (as we just said) added an important qualification, applicable when courts decide whether a party *has* agreed that arbitrators *should* decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so. [Citations.] In this manner the law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption. [Citations.]

"But, this difference in treatment is understandable. The latter question arises when the parties have a contract that provides for arbitration of some issues. *In such circumstances, the parties likely gave at least some thought to the scope of arbitration.* And, given the law's permissive policies in respect to arbitration [citation], one can understand why the law would insist upon clarity before concluding that the parties did not want to arbitrate a related matter. [Citation.] On the other hand, the former question—the 'who (primarily) should decide arbitrability' question—is rather arcane. *A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers.* [Citation to the same law review article mentioned in *Warrior & Gulf,* 363 U.S. at p. 583, fn. 7.] And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to *interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.* [Citations.]" (*First Options, supra,* 514 U.S. at pp. 944–945, italics added, original italics omitted.)

don't get to appellate courts. Cases that do get to the appellate courts often turn on the problem of whether an agreement to be bound by a certain body of rules e.g., American Arbitration Association or National Association of Securities Dealers rules, is *itself* sufficient to show that the parties "clearly and unmistakably agreed" that arbitrators would decide their own jurisdiction.

Two California appellate cases, *Dream Theater, supra*, 124 Cal.App.4th 547, and *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110 [39 Cal.Rptr.3d 437] (*Rodriquez*) have gone so far as to conclude that incorporation of American Arbitration Association rules by reference *was* sufficient to "clearly and unmistakably" provide that arbitrators would have jurisdiction to decide their own jurisdiction. However, in those cases the appellate courts operated on the premise the American Arbitration Association rule providing for arbitrators to decide their own jurisdiction *actually existed at the time the contract was signed*. In *Dream Theater* we know the contract was signed after the adoption of rule 8, since the opinion mentions that the contract had been signed in October 2001. (*Dream Theater, supra*, 124 Cal.App.4th at p. 550; see fn. 2, *ante*.) And while the *Rodriquez* opinion does not tell the reader precisely when the arbitration contract was signed, its treatment of the issue strongly suggests that AAA rule 8 was similarly in effect at the time of signing. If it wasn't, the opinion certainly gives no hint of that fact, or of any issue raised in that regard.[10]

We think that *Dream Theater* and *Rodriquez* represent the outer limits of the use of incorporation by reference of some body of rules incorporated by reference to confer upon arbitrators the power to decide their own jurisdiction. At least in those cases, the parties could go *look up* the AAA rules to which they were agreeing beforehand, and see that, yes, they were conferring on arbitrators the power to decide if a dispute was arbitrable in the first place. To go beyond the incorporation of an *existent* rule and allow for the incorporation of a rule that might not even come into existence in the future, however, contravenes the clear and unmistakable rule. We decline to take the next step beyond *Dream Theater* and *Rodriquez*.

---

[10] Here is the text from *Rodriquez* on the subject: "Although the scope of an arbitration clause is generally a question for judicial determination, the parties may, by clear and unmistakable agreement, elect to have the arbitrator, rather than the court, decide which grievances are arbitrable. [Citation.] Here, the parties clearly and unmistakably agreed to have the arbitrator determine the scope of the arbitration clause. The contract mandates arbitration in accordance with the American Arbitration Association's Construction Industry Rules. Rule 8(a) of those rules specifies the 'arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, *scope* or validity of the arbitration agreement.' (Italics added.) By incorporating rule 8(a) into their agreement, the parties clearly evidenced their intention to accord the arbitrator the authority to determine issues of arbitrability. (See *Shaw Group Inc. v. Triplefine Intern. Corp.* (2d Cir. 2003) 322 F.3d 115, 124–125.)" (*Rodriquez, supra*, 136 Cal.App.4th at p. 1123.)

Incorporating the *possibility* of a *future* rule by reference simply doesn't even meet the basic requirements for a valid incorporation by reference under simple state contract law.

■ Most basically, what is being incorporated must *actually exist at the time of the incorporation,* so the parties can know exactly what they are incorporating. (See *Estate of Plumel* (1907) 151 Cal. 77, 80 [90 P. 192] ["in order to make out a case for the application of the doctrine of incorporation by reference, the paper referred to must not only be in existence at the time of the execution of the attested or properly executed paper, but that it must be referred to in the latter as an existent paper, so as to be capable of identification"].)

Put another way, to have a valid incorporation by reference, the terms of the document being incorporated must be " ' "known or easily available" ' " to the contracting parties. (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1331 [90 Cal.Rptr.3d 589] [" ' "For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." ' "].)

"Prediction," said Niels Bohr, "is very difficult, especially about the future." A rule that does not exist at the time of incorporation by reference fails the elementary test of being known or easily available at the time of incorporation. To allude to that old medieval con game from which we get the expression "pig in a poke"—where an unsuspecting buyer would buy what he or she thought was a pig in a bag only to later discover that it was an inedible cat or rat—in both *Dream Theater* and *Rodriquez* there was at least *something* in the bag that the parties could look at. Here, by contrast, the bag was empty at the time of the transaction and *might* or might *not,* be later filled with a pig. Or a cat or rat or, for that matter, nothing.

### b. The Federal Circuit Split on Incorporation of the Analogous NASD Rule

Also instructive is a current split in the federal appellate courts about whether contracts providing for arbitration of securities disputes do—or do not—incorporate a rule promulgated by the National Association of Securities

Dealers (NASD) allowing arbitrators to decide their own jurisdiction. (See Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2008) ¶ 5:214.5, p. 5-150.) At the moment, by a count of five to three, the majority of federal circuits have held that mere incorporation of NASD rules is insufficient to show a clear and unmistakable agreement to have arbitrators decide their own jurisdiction. The Third, Sixth, Seventh, Tenth and Eleventh Circuits are in the majority; the Second, Fifth and Eighth Circuits are in the minority.

We think the majority rule—saying that mere agreement to be bound by NASD rules is insufficient—is the more persuasive rule, because the opinions so holding pay more attention to the basic analysis laid down in *First Options*, or, in pre-*First Options* cases, *AT&T*. (See *PaineWebber, Inc. v. Hofmann* (3d Cir. 1993) 984 F.2d 1372, 1379, fn. 4 [decided prior to *First Options*, but relying on *AT&T* to say: "While parties may contract to submit questions of arbitrability to the arbitrators . . . the contractual language doing so must be clear and unmistakable . . . . The language here is not sufficiently clear and unmistakable to constitute a submission of arbitrability to the arbitrators." (Citations omitted.)]; *Smith Barney, Inc. v. Sarver* (6th Cir. 1997) 108 F.3d 92, 96 ["We join a majority of circuits in holding that in cases of this type, the eligibility determination of the Sarvers' claims cannot be submitted to arbitration notwithstanding both provisions since neither provides clear and unambiguous language to the contrary."[11] (And citing *First Options*.)]; *Miller v. Flume* (7th Cir. 1998) 139 F.3d 1130, 1134 ["Even if it would not do violence to the language of section 35 to conclude that arbitrability may also be resolved by the arbitrators, this is not the kind of clear and unmistakable language that *First Options* requires."]; *Cogswell v. Merrill Lynch, Pierce, Fenner & Smith* (10th Cir. 1996) 78 F.3d 474, 481 [citing *First Options* as authority to reject idea that § 1 of NASD rules, which states it is " 'for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association' " was clear and unmistakable agreement to allow arbitrators to decide their own jurisdiction in regard to whether a matter was time-barred]; and *Merrill Lynch, Pierce, Fenner & Smith v. Cohen* (11th Cir. 1995) 62 F.3d 381, 384 [after citing the reverse presumption language from *First Options*, stating that § 35 did not provide " ' "clear and unmistakable evidence" ' of the parties' intent to allow the arbitrator to determine the timeliness of the claim"].)

---

[11] *Smith Barney* was overruled on an unrelated point in *Vaden v. Discover Bank* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 206, 129 S.Ct. 1262], which held, contrary to *Smith Barney*, that a federal court may "look through" a petition to compel arbitration brought under the Federal Arbitration Act to the parties' underlying substantive controversy in order to determine whether petition is predicated on an action that arises under federal law.

The minority cases, by contrast, do not focus on what *First Options* made explicit (and *AT&T* had earlier implied), about the importance of the parties *specially focusing* on the issue. Rather, their approach is that the parties agreed that all disputes would be arbitrated between them, and jurisdiction to decide jurisdiction is necessarily included in the category of all disputes. (See *PaineWebber Inc. v. Bybyk* (2d Cir. 1996) 81 F.3d 1193, 1199 [the "words 'any and all' are elastic enough to encompass disputes over whether a claim is timely and whether a claim is within the scope of arbitration"]; *Smith Barney Shearson, Inc. v. Boone* (5th Cir. 1995) 47 F.3d 750, 754 [not citing *First Options* at all and stating that "broad language" of agreement was sufficient to make "clear" that "defendants intended to have 'any controversy' arising between them resolved through arbitration"]; *FSC Sec. Corp. v. Freel* (8th Cir. 1994) 14 F.3d 1310, 1312–1313 [decided prior to *First Options*, and saying that: "As noted above, the parties expressly agreed to have their dispute governed by the NASD Code of Arbitration Procedure. This means they adopted the entire NASD Code, including Section 35. Unlike the Seventh Circuit, we hold that the parties' adoption of this provision is a 'clear and unmistakable' expression of their intent to leave the question of arbitrability to the arbitrators. In no uncertain terms, section 35 commits interpretation of all provisions of the NASD Code to the arbitrators."].)

Particularly in the case before us, where the contract expressly carves out a large swath that otherwise is not subject to arbitration—discretionary matter—the majority federal cases are persuasive. And it is to the problem of exactly what falls within that swath that we now turn.

### B. Is the Buyout Clause Within the Ambit of the Arbitration Agreement? No.

The salient language as to what is arbitrable in the agreement is found in the arbitration clause, which begins with words that exempt "matters which are expressly within the discretion of the Members." The first two sentences of the clause are: "Any controversy or dispute arising out of or relating to this agreement or the breach thereof (*exclusive of matters which are expressly within the discretion of the Members*) shall be settled by binding arbitration. Such arbitration shall be effected by arbitrators selected as hereinafter provided and shall be conducted in accordance with the Rules of the American Arbitration Association existing at the date thereof. . . ." (Italics added.)

The word "matters" is not defined in the definitions part of the agreement, that is, it is not a term of art. We must therefore give it the meaning an ordinary person would give it, and an ordinary person would give it a very broad meaning indeed. Its most basic definition is the "stuff of which a thing is made" (9 Oxford English Dict. (2d ed. 1989) p. 479) and in the sense most connected to the use of the word in a contract is simply, "Material for expression; something to say." (*Id.* at p. 480.)

Neither is the word "discretion" defined in the agreement. It too has a broad ordinary meaning. The very first definition of "discretion" in the Oxford is "[t]he action of separating or distinguishing, or [the] condition of being distinguished or disjunct; separation, disjunction, distinction." (4 Oxford English Dict. (2d ed. 1989) p. 756.)

The "matters" that the Yee parties want arbitrated—as defined in its very petition—are its claims that (a) it properly exercised its rights under the buyout clause and (b) whether La Quinta must *either* (i) pay $13.3 million to buy out the Yee parties or (ii) transfer its entire interest in the company to the Yee parties.

Here is the buyout clause. The italicized words demonstrate that, at the several stages of the buyout process, each party is in control of "matter" that is expressly discretionary, that is, calls for the action of distinguishing separating or distinguishing among two or more choices:

"In the event of a dispute among the Members which cannot be resolved, then either Member ('*Electing member*') may *elect* to *either* buy the other Member's Interest or sell its own Interest to the other Member as follows: The Electing member shall give written notice thereof to the other member ('Other Member') within fifteen (15) days after the date of the event which gives rise to the right to make such election. Within fifteen (15) days after delivery of such notice, the Electing Member shall deliver to the Other Member an offer ('Offer' for purposes of this Section 2.3 only) in writing, stating the cash purchase price under which the Electing Member is *willing to purchase* the entire interest of the Company in the Real Property (gross assets less all liabilities including contingent liabilities) and a calculation of the amount that would be payable to the Other Member if a hypothetical case sale were to occur at that cash price (and a calculation of the amount that would be payable to the Electing Member upon the same hypothetical cash

sale at that cash price). The Offer shall also state *an offer to sell* the Electing Member's interest in the Company at a cash price equal to the amount that would be payable to the Electing Member if a hypothetical cash sale were to occur at the cash price specified in the Offer. For purposes of calculating the amount that would be payable to the Electing or Other Member upon a hypothetical cash sale, the proceeds thereof would be distributable and allocated in the manner set forth in Section 7.3 [Section 7.3 gives an order of priorities for distribution of cash to members; beyond that we will not attempt to describe it].

"The Other Member, upon receipt of the Offer shall have sixty (60) days in which *to elect* either to: (i) *purchase* the Electing Member's interest at the stated price (calculated in accordance with the Offer) or (ii) sell to the Electing Member the Other Member's interest at the stated price (calculated in accordance with the Offer). *If* the Other Member *elects to sell* its interest to the Electing Member, (or *fails to respond* within the time permitted), the Electing Member shall purchase the other Member's interest at the amount stated to be payable to the Other Member in the Offer. *If* the Other Member *elects to purchase the interest* of the Electing Member, the Other Member shall purchase the Electing Member's interest at the same price calculated in accordance with the Offer from the Electing Member. In either case, the purchase price shall be paid in cash at the closing of such sale.

"The closing of a purchase pursuant to this Section 2.3 shall be held at a *mutually acceptable place on a mutually acceptable date* not more than ninety (90) days after receipt of the written notice of the Electing Member's election under Section 2.3 hereof. At such closing, the selling party shall assign to the purchasing party, in order to properly set forth the record title to the assets of the Company, shall covey [*sic*] and transfer to the purchasing party with covenants of special warranty, an undivided percentage interest in the assets of the Company and execute all other documents that may be necessary to effectuate the purpose of this Agreement, and the purchasing party shall pay the purchase price therefor in cash or by a cashier's or certified check from a bank acceptable to the selling party. The purchasing party shall assume the obligations of the selling party under this Agreement and under the Company.

"If the Other Member fails *to elect to either buy or sell* pursuant to the Offer within the prescribed time period, the Electing Member, *at its option*, may (i) continue the Company, or (ii) *elect* within thirty days to buy the interest of the Other Member pursuant to the Offer." (Italics added.)

 The trial court was correct in determining that these "somethings to say" are "expressly" within the "discretion" of the parties. There just is too much choice—too much *discretion*—in this I-can-either-buy-you-out-or-you-can-buy-me-out-whatever-you-or-I-prefer arrangement for it not to be discretionary "matter" under the threshold language of the arbitration clause.

The Yee parties argue that there really isn't any discretion in the operation of the buy out agreement, other than, obviously the initial choice to invoke it. For them, it is essentially a machine that grinds to one of two inexorable results (you're bought out or you get bought out) once a lever is thrown.

The argument is reminiscent of the problem of the standard of review often faced by reviewing courts. "Discretionary matters" are typically matters within which there is a *range* of relatively free choice as long as the choice is "reasonable," while nondiscretionary matters have a throw-the-lever binary quality about them (e.g., bring a motion for summary judgment and it should, or should not, be granted—there is no middle ground). That is, as the Yee parties basically argue: Well, sure, there may be a lot of "choice" built into the buyout provision, but once the provision is triggered (by the binary either-or choice of the "Electing Member" to buy—or sell—its interest), the provision only allows for a series of forced binary choices (e.g., respond to offer, don't respond to the offer, decide to buy, decide to sell) that really aren't matters of "discretion."

No. That line of reasoning fails because only people afflicted with law degrees think of "discretion" as *necessarily* entailing a range of choice to be evaluated on a reasonability standard. A simple binary choice as here (shall I buy or shall I sell?) qualifies under the ordinary person's definition of discretion as well. Discretion is simply the act of separating or distinguishing, and that includes binary choices as well as ranges.

Our analysis is confirmed when we consider that the Yee parties' own petition identified matters which necessarily involve member choice: whether the Yee parties properly invoked the buyout clause in the first place, and, if they did, who has in effect elected to buy whom out, and for what.

The order denying arbitration is affirmed. The trial court's dicta that the buyout provision is not a "matter" for arbitration was correct.

La Quinta shall recover its costs on appeal.

Bedsworth, J., and Aronson, J., concurred.