**FILED**
**April 10, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 18-0605 – *TD Auto Finance LLC, Focus Receivables Management, and Northstar Location Services, LLC, v. Freddie Reynolds and Shelby Reynolds*

Hutchison, J., concurring:

I write separately to emphasize what this case *is* and what it *is not* about. I also write to point out that the position propounded by petitioner TD Auto Finance would create chaos in the law of contracts.

First, and foremost, this case *is not* about arbitration. Admittedly, the contract provision the parties are dickering over concerns arbitration. Additionally, in its brief, TD Auto Finance cites a string of federal arbitration cases, insists that this Court's authority is "extremely limited," and argues that federal law emphatically mandates that we send this case to arbitration. This argument ignores, however, the fundamental rule that arbitration contracts are subject to interpretation using general principles of state contract law, not federal law. *See*, *e.g.*, *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."); *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W. Va. 421, 435, 781 S.E.2d 198, 212 (2015) ("[A]n agreement to arbitrate is a contract. The rights and liabilities of the parties are controlled by the state law of contracts."). Moreover, the federal law cited by TD Auto Finance is largely irrelevant because, at its heart, this case has absolutely nothing to do with arbitration.

1

This case *is* a dull, run-of-the-mill, state-law contract interpretation case. Every first-year law student knows that a contract is defined as one party's acceptance of another's offer of specific terms (along with an exchange of consideration). *Dan Ryan Builders, Inc. v. Nelson*, 230 W. Va. 281, 287, 737 S.E.2d 550, 556 (2012) ("The elements of a contract are an offer and an acceptance supported by consideration."). If any one of the three elements (offer, acceptance, or consideration) is missing, then no contract is formed. Logically, an offer – with all of its terms – must precede the opposite party's acceptance of those very same terms. "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 121 (2d Cir. 2012). Accordingly (and this shouldn't have to be said), an offeree cannot "know" about an offer and assent to it *before it even exists. See Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, 251 P.3d 1091, 1095 (Colo. App. 2010) ("[W]e are aware of no precedent holding that parties can clearly know of and assent to contract terms that do not yet exist[.]").

This case is about a sub-doctrine of contract law, the doctrine of "incorporation by reference." The long-standing rules of contracts recognize that parties can make a new contract, and in that new contract refer to other, *existing* documents or contracts. Stated another way, a party can offer to form a contract using terms written in other documents; the opposing party may then accept those terms. Those other materials must be clearly identified so there is no doubt by both parties as to what they are agreeing to. As noted above, an offeree cannot assent to something that does not exist.

2

This Court summarized the doctrine of incorporation in this way:

> In the law of contracts, parties may incorporate by reference separate writings together into one agreement. However, a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement. To uphold the validity of terms in a document incorporated by reference, (1) the writing must make a clear reference to the other document so that the parties' *assent* to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be *ascertained beyond doubt*; and (3) it must be certain that the parties to the agreement had knowledge of and *assented to* the incorporated document so that the incorporation will not result in surprise or hardship.

Syllabus Point 2, *State ex rel. U-Haul Co. of W.Va. v. Zakaib*, 232 W. Va. 432, 752 S.E.2d 586 (2013) (emphasis added).

The key term throughout the *U-Haul* Court's discussion of the incorporation doctrine is the word "assent." When a court weighs the validity of a provision incorporated into a contract by reference, the court's focus is whether the contracting parties knew of and assented to the incorporated provision. A meeting of the minds and mutuality of assent are the most basic ingredients of a contract.

Central to the notion of "assent" is that the parties must know, at the moment they form their contract, what they are agreeing to: if a term in the new, incorporating contract is buried in an older, existing document, then the reference in the new contract has to be clear "so that the parties' assent to the reference is unmistakeable." *Id*. In most instances, to incorporate by reference some collateral document, the new, incorporating contract must expressly and sufficiently describe another document *that exists*. As one

3

court said, "what is being incorporated must *actually exist at the time of the incorporation*, so the parties can know exactly what they are incorporating." *Gilbert St. Developers, LLC v. La Quinta Homes, LLC*, 174 Cal. App. 4th 1185, 1194 (2009). *See also In re Plumel's Estate*, 90 P. 192, 193 (Cal. 1907) ("in order to make out a case for the application of the doctrine of incorporation by reference, the paper referred to must not only be in existence at the time of the execution of the attested or properly executed paper, but that it must be referred to in the latter as an existent paper, so as to be capable of identification."). Where the term referred to in a new contract is not in existence at the time the parties form the principal contract, the enforceability of the term is in jeopardy.[1]

---

[1] As a general principle, incorporating nonexistent, future terms into a present contract usually imperils the enforceability of those terms:

> Where the document referred to is not in existence at the time the principal contract is made, the enforceability of the incorporated terms may be jeopardized. Where the principal agreement contains the essential elements of a valid contract, and further binds the parties to terms to be established by one party *in futuro*, the danger exists that the critical elements of knowledge of, and assent to, the additional terms will be missing. If the provisions to be incorporated will only explain or particularize the obligations of the parties under the principal contract, there is no obstacle to the enforcement of those supplemental provisions. But where the added terms, established by one of the parties, modify or contradict a material term of the original valid contract, the incorporated terms must fall.

*Hous. Auth. of City of Hartford v. McKenzie*, 36 Conn. Supp. 515, 519, 412 A.2d 1143, 1145-46 (Super. Ct. 1979). Accord *Lamb v. Emhart Corp.*, 47 F.3d 551, 559 (2d Cir. 1995). *See also Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, 251 P.3d 1091, 1095 (Colo. App. 2010) (finding parties did not agree to incorporate into their contract amendments to American Arbitration Association rules made after adoption

That brings me to the problem in the instant case: the one of temporality. Time goes forward; as much as we would like, we cannot roll back the clock. Likewise, incorporation by reference is unidirectional, that is, it "occurs in one direction: it pulls material into the incorporating contract." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 755 (Ind. 2018). When parties make a new contract, they can agree to

---

of the contract. "Indeed, we are aware of no precedent holding that parties can clearly know of and assent to contract terms that do not yet exist when, as here, the term is in abrogation of statutorily expressed public policy, the parties do not expressly agree to be bound by future amendments, neither party has any control over subsequent amendments, and there is no ascertainable standard for the promulgation of amendments or new rules."); *Gilbert St. Developers, LLC v. La Quinta Homes, LLC*, 174 Cal. App. 4th 1185, 1194, 94 Cal. Rptr. 3d 918, 924 (2009) (Same. "Incorporating the *possibility* of a *future* rule by reference simply doesn't even meet the basic requirements for a valid incorporation by reference under simple state contract law. . . . A rule that does not exist at the time of incorporation by reference fails the elementary test of being known or easily available at the time of incorporation.").

Likewise, parties cannot agree today to make a future contract, unless the parties have assented to all the material terms of the future contract.

> [U]nless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, it is nugatory.
>
> To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations. Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties; but where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon. If any essential term is left open to future consideration, there is no binding contract, and an agreement to reach an agreement imposes no obligation on the parties thereto.

*Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 735 (Miss. 2019).

5

incorporate into the contract terms from another document that already exists. Parties

cannot agree to the opposite: they generally cannot insist that a term in a present contract

automatically incorporate itself into a new, future agreement that does not exist. One

cannot assent to something that does not exist. Incorporation by reference pulls existing

material into the new, incorporating contract; it does not push material terms into non-

existent, as-yet-unassented-to future contracts.

The petitioners are arguing to subvert this basic rule of contract law and are

essentially making an argument for "reverse incorporation." Let me explain, in the context

of the sparse record from the circuit court.

Freddie and Shelby Reynolds signed a "retail installment sales contract"

("RISC") with Crossroads Chevrolet to buy a pickup truck. The RISC contained a zipper

clause[2] which plainly says that the RISC "contains the entire agreement between"

Crossroads and the Reynoldses. The clause says that the RISC is the complete and final

agreement, and it says the terms of the RISC supersede any other understandings or oral

---

[2] A "zipper clause" is defined as a "contractual provision that operates as both an integration clause and as a no-oral-modification clause." *Black's Law Dictionary* 1855 (10th Ed. 2009). *See Pace v. Honolulu Disposal Serv., Inc*., 227 F.3d 1150, 1159 (9th Cir. 2000) ("Notable in this case is the inclusion of a 'zipper clause' . . . so called because the combination of the integration and no-oral-modification clauses is intended to foreclose claims of any representations outside the written contract aside from those made in another written document executed by the parties."). Synonymously, an "integration clause" is a "contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." *Black's Law Dictionary* at 929. Other synonyms include "merger clause" and an "entire-agreement" or "entire-contract" clause.

agreements regarding the Reynoldses' decision to buy a pickup truck from Crossroads. There is no agreement to arbitrate anywhere in the RISC. TD Auto Finance is nowhere mentioned in the terms of the RISC. Moreover, there is no language suggesting, in any way, that the RISC incorporates by reference some pre-existing document.

Put simply and logically, neither the Reynoldses nor Crossroads Chevrolet assented to arbitrate disputes regarding the RISC.

Without any input by, or apparently any knowledge to, the Reynoldses, Crossroads Chevrolet assigned the RISC to TD Auto Finance. TD Auto Finance now claims that Mr. and Mrs. Reynolds have defaulted on the RISC, have forfeited the pickup truck purchased in the RISC, and that the Reynoldses owe additional damages under the terms of the RISC. TD Auto Finance has persistently, and possibly in violation of West Virginia's credit protection laws, been pursuing repayment of monies due under the RISC.

Despite having built their entire substantive case on the RISC, TD Auto Finance focuses this appeal on a wholly separate, preexisting document: the credit application. The credit application in this case is a form prepared by "RouteOne" (and we know this because at the top of each page, in bold text, is the heading "RouteOne®."). RouteOne bills itself as a company that "provides automobile financing system solutions, which include credit applications . . . to provide a single portal to accommodate the entire

credit application process for [automobile] dealers and finance sources."[3]  An auto dealer like Crossroads Chevrolet can use a RouteOne credit application, and the RouteOne computer system, to access "a network of 1,500+ finance sources" to help customers finance their vehicle purchases.[4]

At some point – we don't know when because there is no record – Mr. and Mrs. Reynolds signed a credit application permitting Crossroads Chevrolet to do a credit check through RouteOne.  The first six substantive paragraphs of the application are written in terms of the Reynoldses "authorizing" a credit check.  The first six paragraphs identify two parties: "I" and "You."  "I" is obviously Mr. and Mrs. Reynolds, as in "I authorize."

---

[3] "RouteOne Overview," https://www.routeone.com/about-us/media-room (last accessed March 26, 2020).  RouteOne represents that it was "created in 2002 by Ally Financial, Ford Motor Credit, TD Auto Finance, and Toyota Financial Services to offer automotive dealerships an alternative to existing systems." *Id.*

[4] "Credit Application System," https://www.routeone.com/dealers/credit-application (last accessed March 26, 2020).  At another point on its internet web site, RouteOne claims to have an even larger number of finance sources, saying: "The RouteOne system streamlines the credit application process with a single point of entry, providing you [auto dealers] access to a network of 1,700+ finance sources, and 200+ Dealership Service Providers."  https://www.routeone.com/dealers/products-and-services  (last accessed March 26, 2020).  We note, however, that elsewhere on its site RouteOne identifies only 89 "eContracting Finance Sources."  "RouteOne Finance Sources," https://www.routeone.com/financesources (last accessed March 26, 2020).  Whatever the number, RouteOne represents that its credit application system was designed by dealers for dealers, and that "[w]ith RouteOne's credit application platform, [auto dealers will] get access to a large network of finance sources to give you and your customers a wide range of vehicle financing options."  https://www.routeone.com/dealers/credit-application.

The term "You" is defined in the application as the "dealer and any finance company, bank or other financial institution to which the Dealer submits my application[.]"

Any reasonable, prudent reading of the first six paragraphs would have lead the Reynoldses to think they were allowing Crossroads Chevrolet and whatever "finance company, bank or other financial institution" to which Crossroads Chevrolet submitted the application to search their credit.

TD Auto Finance bases its whole theory on the seventh paragraph, buried at the bottom of page 3, which explicitly says it "applies to applications submitted to TD AUTO Finance LLC Only[.]" Remember, RouteOne's webpage says it has credit arrangements with over a thousand finance companies, banks, and institutions. There is nothing in the record saying Mr. or Mrs. Reynolds knew that Crossroads Chevrolet was submitting their credit application to TD Auto Finance, so it takes a leap of legal faith to say the Reynoldses "assented" to anything in the seventh paragraph.

Still, that seventh paragraph says that *if* Crossroads Chevrolet submits the application to TD Auto Finance, *then* an arbitration agreement exists between "YOU AND TD AUTO FINANCE LLC." The arbitration language does not apply to any other financier, only TD Auto Finance. However, it bears noting that, in this paragraph, the drafter of the RouteOne credit application has changed the meaning of "You." In the prior six paragraphs, "You" meant the dealership and the "finance company, bank or other

9

financial institution." In paragraph seven, "you" suddenly has to be interpreted as Mr. and Mrs. Reynolds.

Basic rules of English and clarity of meaning aside, and despite the fact that the credit application is missing an entire page, counsel for Mr. and Mrs. Reynolds concedes that an arbitration agreement exists between the Reynoldses and TD Auto Finance, at least regarding the credit application.[5]

The problem in this case is that TD Auto Finance wants to contort the arbitration clause to apply beyond the credit application – namely, it wants the Court to incorporate the clause into the agreement reached later (the RISC). To support this stretch, TD Auto Finance makes its plea for the Court to create a "reverse incorporation" rule. Buried on page six of the credit application is language claiming to extend the credit application's arbitration agreement to "any installment sale contract . . . or any resulting transaction or relationship[.]" In other words, TD Auto Finance claims that when the Reynoldses signed the credit application, they were assenting to incorporate some of the terms of the application into a future contract that may, or may not, ever exist. As the

---

[5] I have read the arbitration language relied upon by TD Auto Finance and find it to be somewhat garbled, at least when read by someone who isn't a lawyer. As it is written, the language requires the arbitration of "any claim or dispute . . . between *our* employees, parents, subsidiaries, affiliate companies, agents, successors or assignees[.]" Non-lawyers would read that language as requiring arbitration of any dispute between TD Auto Finance and its own employees, parents, subsidiaries, etc. It is only when you realize that the document elsewhere defines "our" as including "the Applicant, Co-Applicant, . . . and Dealer, and TD Auto Finance" that lawyers can find the meaning relied upon by TD Auto Finance.

majority opinion makes clear, that argument rubs completely against the grain of contract law.

Incorporation by reference is a one-way street, where a new contract pulls in existing documents that are unmistakably identified in the new contract so that the knowledge and assent of the parties to the incorporation of the documents is clear. Parties cannot draft a contract that injects terms into future, non-existent contracts. TD Auto Finance's reverse-incorporation argument is especially offensive when you consider that the future contract at issue here has *completely different parties*. Remember, TD Auto Finance was not a party to the RISC; it only became a "party" when Crossroads Chevrolet assigned the RISC, sometime after Mr. and Mrs. Reynolds had assented to the terms of the RISC. In other words, TD Auto Financing is arguing that a few paragraphs of the application signed by the Reynoldses should be incorporated into the Reynoldses' contract with Crossroads Chevrolet.

If arbitration of the RISC was a provision that was material and important to TD Auto Finance, then it should have refused to accept Crossroad Chevrolet's assignment of the RISC that did not contain an arbitration provision. Alternatively, it could have insisted that Crossroads Chevrolet place an arbitration provision into its RISC form before Crossroads Chevrolet offered it to Mr. and Mrs. Reynolds. TD Auto Finance did none of these things.

11

The arguments proffered by TD Auto Finance would, if adopted by this Court, have brought havoc to the law of contracts. In the business context, it is routine for companies to sign a series of contracts over many months or years. Under TD Auto Finance's theory, one party could slip a term into an early contract that "self-incorporates" years later into a subsequent contract. Worse, those terms could be in conflict. I could foresee an early contract requiring arbitration of "this and any other" dispute, and a later contract giving the parties the right to seek a courtroom resolution of disputes. Which provision controls? As I said, TD Auto Finance's position is contrary to the law of contracts and a recipe for chaos.

When Crossroads Chevrolet offered a pickup truck for sale according to the terms in the RISC, Crossroads Chevrolet's offer did not contain an arbitration provision. When Mr. and Mrs. Reynolds accepted the offer, they did not assent to arbitrate any disputes with Crossroads Chevrolet. Accordingly, under basic, run-of-the-mill rules of contract interpretation, the Reynoldses are not bound to arbitrate their dispute with TD Auto Finance regarding the RISC.

I otherwise respectfully concur with the majority's opinion.