## A09A2268. SCOVILL FASTENERS, INC. v. NORTHERN METALS, INC.
### (692 SE2d 840)

DOYLE, Judge.

Northern Metals, Inc. sued Scovill Fasteners, Inc. for breach of contract based on Scovill's failure to pay for metal raw material delivered to Scovill by Northern. Scovill counterclaimed, alleging that Northern had breached by failing to deliver the metal in compliance with contractual specifications and deadlines. Following a bench trial, the trial court awarded Northern certain damages, including pre-judgment interest, offset by other damages awarded to Scovill. Scovill filed this appeal contending that the trial court erred by (1) considering parol evidence in interpreting a written two-week delivery deadline, and thereby barring certain cover damages for deliveries past the deadline, (2) denying Scovill's counterclaim for certain alleged overcharges, and (3) awarding pre-judgment interest pursuant to OCGA § 7-4-16. For the reasons that follow, we affirm in part and reverse in part.

While we apply a de novo standard of review to any questions of law decided by the trial court, factual findings

---

[46] *Thomas v. State*, 254 Ga. App. 226, 230 (5) (a) (561 SE2d 444) (2002).
[47] See id.

made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Because the clearly erroneous test is in effect the same standard as the any evidence rule, appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them.[1]

So viewed, the evidence shows that in late 2003, Scovill issued a Request for Quotation ("RFQ") to suppliers of raw materials for Scovill's metal fastener manufacturing business. Northern responded and was called to meet to discuss the terms of the contract. The RFQ included a provision stating that pricing would be discounted by two percent if Scovill paid within forty-five days of shipment; Northern negotiated a change, memorialized in an RFQ update, that deleted the discount and required Scovill to pay within sixty days of shipment. The RFQ also included a provision stating that lead times for delivery would be "[o]ne week for designated stock keeping items, [two] weeks for all other items." In the RFQ, Scovill promised to provide "a forecast of usage quarterly for the three months going forward," to allow suppliers to obtain necessary stock. Before Northern was awarded the contract, Northern made it clear to Scovill that it would need a three-month lead time to begin stocking any items, because they were coming from overseas suppliers. Northern was selected as a provider under the RFQ to supply a Georgia-based plant. Northern was also selected to provide a one-time delivery of material to a Scovill facility in Hong Kong.

From the beginning of the contract in February 2004, Scovill encountered delays with Northern's shipments to both the Georgia facility and the Hong Kong facility. Based on the delays, Scovill refused to pay for the shipments within the required 60-day time frame, and in some cases (including the Hong Kong shipment), Scovill did not pay at all despite ultimately receiving and accepting the material. In December 2004, Scovill instructed Northern not to order any more material from its overseas supplier, and Northern informed Scovill that it would not ship any more material until certain outstanding balances were paid. The last shipment Scovill received was in March 2005.

Northern sued Scovill for breach of contract seeking damages for unpaid principal on shipped material, unpurchased material, interest, and attorney fees. Scovill answered and counterclaimed, seeking payment for overcharges and cover damages it incurred as a result of

---

[1] (Citations and punctuation omitted.) *Lifestyle Home Rentals v. Rahman*, 290 Ga. App. 585, 585 (660 SE2d 409) (2008).

the delayed shipments. Following a bench trial, the trial court ruled that Scovill failed to pay for certain delivered material and entered judgment against Scovill for $281,175.29 in principal (for the material) and $109,320.86 in interest for delayed payment. The trial court also entered judgment against Northern for $21,710.45 for certain of Scovill's cover damages and Northern's overcharges. Scovill now appeals.

1. Relying on the parol evidence rule, Scovill contends that the trial court erred in denying its claim for cover damages incurred when materials over the stock amounts were not delivered within the written two-week deadline provided in the RFQ. We disagree.

At trial, the evidence showed that to execute the contract, Scovill issued blanket purchase orders containing specifications for material but no amounts or actual delivery dates. Then, on an as-needed basis, Scovill would issue Northern "releases" that specified how much of what material was needed. Northern expected that it could rely on Scovill's three-month lead time to obtain material from its overseas supplier and keep material in stock for timely release to Scovill. At times, the three-month predictions were overwhelmed by Scovill's requirements, and for various other reasons, including a fire at the overseas mill, most if not all of Northern's shipments were ultimately delayed.

The trial court found that, due to Northern's delays, Scovill "did in fact obtain metal product from other vendors at a higher cost than what it had contracted to pay [Northern] for the same product." However, the court ruled that Scovill was not entitled to all of the cover damages it sought, specifically excluding cover damages "where the amount of metal product purchased from other venders exceeded the amounts required to be kept on hand in the annual usage and stock requirement document provided by [Scovill] to [Northern]."

This ruling was based on the nature of the negotiated RFQ process and evidence of a mutual understanding between Scovill and Northern that Northern was ordering material from overseas and would need three months to obtain any amounts of material it would deliver under the contract. Scovill acknowledges that conversations occurred to this effect, but it now argues that, despite the clear communication by Northern, Northern was bound by the written RFQ provision defining delivery deadlines as "[o]ne week for designated stock keeping items, [two] weeks for all other items." In essence, Scovill argues that the written two-week deadline for "all other items" is dispositive as to *any* material it ordered.

As this was a contract for the sale of goods, we analyze the

contract and its execution under the Uniform Commercial Code.[2] Pursuant to OCGA § 11-2-202:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing *intended by the parties as a final expression of their agreement* with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a) By course of dealing or usage of trade (Code Section 11-1-205) or by course of performance (Code Section 11-2-208); and
>
> (b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.[3]

As a threshold matter, the trial court ruled that the parties' actual agreement was not contained in any one document, such as the RFQ. Instead, the trial court looked to the RFQ, "subsequent verbal negotiations between the parties, the initial [purchase orders] sent by [Scovill] to [Northern], and the running annual usage document and the stock requirements documents provided via email from [Scovil] to [Northern]." This finding was supported by the evidence, including the RFQ itself, which anticipated that necessary terms such as material specifications, quantities, pricing information, and delivery dates would be supplied as part of the bidding and ordering process. Even the purchase orders themselves lacked quantity information and actual delivery dates. Therefore, the trial court correctly considered matters outside the RFQ to determine the parties' intended final obligations under the agreement.

Furthermore, with respect to the specific written terms in the RFQ, the relevant provisions are entitled "Lead Time," defined as "[o]ne week for designated stock keeping items, [two] weeks for all other items," and "Forecasting," which stated that "Scovill will provide a forecast of usage quarterly for the three months going forward." The written provisions of the RFQ did not define the term "stock keeping items," nor did the RFQ identify or designate the

---

[2] See OCGA § 11-2-102; *PCS Joint Venture v. Davis*, 219 Ga. App. 519, 520 (1) (465 SE2d 713) (1995) (UCC "applies to transactions in . . . all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale") (citation and punctuation omitted).

[3] (Emphasis supplied.)

"stock keeping items" or address the stock-keeping provision's relationship to the three-month forecast that was promised by Scovill. In light of this lack of clarity, the trial court did not err in considering the parties' behavior and their courses of performance and dealing, including that Northern relied on the promised three-month forecast to stock material sufficient to meet the delivery deadlines. The UCC's parol evidence rule

> makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used.[4]

Similarly, OCGA § 11-2-208 (2) provides that "[t]he express terms of the agreement and any such course of performance . . . shall be construed whenever reasonable as consistent with each other." The evidence showed that before, during, and after accepting Northern's bid, Scovill was aware of Northern's overseas supply chain and did not object to Northern's stated reliance on the promised three-month forecast to obtain material. Therefore, the trial court did not err in construing the written terms of the contract in light of this understanding and thereby denying Scovill cover damages for items exceeding the usage data provided to Northern.

2. Scovill next contends that the trial court erred in denying its counterclaim for Northern's erroneous overcharges on material delivered and accepted after Scovill requested Northern to stop sourcing material for delivery. We agree.

By December 2004, Northern had failed on numerous occasions to supply materials in a timely fashion (even with a three-month lead time), and Scovill had failed to pay for a number of deliveries when they were finally completed. Because of the damaged relationship, Northern notified Scovill that it needed to "get some [overdue invoices] cleaned up before shipping more product," and Scovill notified Northern that "[u]ntil some of the following issues [no

---

[4] (Punctuation omitted.) *Warren's Kiddie Shoppe v. Casual Slacks*, 120 Ga. App. 578, 580 (1) (171 SE2d 643) (1969) (parol evidence admissible to construe shipment term "June-Aug."). See also *Golden Peanut Co. v. Bass*, 275 Ga. 145, 149 (3) (563 SE2d 116) (2002) (parol evidence admissible to define the term "floor price").

response to e-mails, inaccurate information, late deliveries, overshipments, identifying a back-up contact] are corrected you should not place any more orders for items you sell to us." From January to March 2005, Northern completed certain final shipments of material already in the supply line.

Scovill's counterclaim asserted that Northern erroneously calculated the prices on many shipments, including the 2005 shipments. After hearing the evidence, the trial court agreed and awarded certain damages to Scovill to compensate for the 2004 overcharges, but the trial court denied Scovill any damages for alleged overcharges on deliveries made after December 2004. The trial court based its ruling on a finding that "[a]lthough some product and payments were exchanged after the first of 2005, these transactions were follow through on transactions begun in 2004. The 2005 transactions were in essence clean up." From a factual standpoint, the evidence supports this finding, and it is undisputed that the 2005 orders and deliveries were made pursuant to the prices specified in the RFQ and original 2004 purchase orders provided to Northern. However, from a legal and logical standpoint, the trial court's conclusion that, as a matter of law, the 2005 deliveries were not subject to the contract pricing was error. In December 2004, each party merely sought performance by the other; neither party purported to enter into a new agreement with different pricing terms. Therefore, to the extent Scovill was overcharged for deliveries made between December 2004 and March 2005 (the date of the last delivery under the contract), Scovill is entitled to recover those overcharges, and the trial court erred in ruling otherwise.

3. Finally, Scovill contends that the trial court erred in awarding Northern pre-judgment interest under OCGA § 7-4-16. We disagree.

OCGA § 7-4-16 provides:

Unless otherwise provided in writing signed by the obligor, a commercial account becomes due and payable upon the date a statement of the account is rendered to the obligor. The owner of a commercial account may charge interest on that portion of a commercial account which has been due and payable for 30 days or more at a rate not in excess of 1 1/2 percent per month [18 percent annually] calculated on the amount owed from the date upon which it became due and payable until paid. "Commercial account" means an obligation for the payment of money arising out of a transaction to sell or furnish, or the sale of, or furnishing of, goods or services other than a "retail installment transaction." . . .

Here, the RFQ was silent as to interest on late payments, but it did require payment within 60 days. Northern's invoices provided that "a finance charge of 1.5 [percent] will be added after 30 days, 18 [percent] annually." Northern's complaint more accurately reflected the agreed-upon 60-day payment deadline, and sought "interest stated on each invoice [of] 18 [percent] per annum after sixty (60) days from invoice date." In light of this request and the proof at trial, the trial court awarded 18 percent interest accruing 61 days after the last invoice was sent in March 2005 (May 21, 2005) through the last date interest was sought at trial (May 12, 2007).

"Under Georgia's Uniform Commercial Code, the buyer must pay at the contract price for any goods accepted."[5] It is undisputed that certain materials were delivered by Northern and accepted by Scovill; therefore, Scovill was responsible for payment according to the agreed-upon price.[6] "Prejudgment interest is allowable only where the amount recoverable is liquidated, i.e., certain and fixed, a sum which cannot be changed by the proof. A debt is liquidated when it is certain *how much is due* and when it is due."[7] Northern's invoices were a due and payable liquidated debt on a commercial account subject to interest under OCGA § 7-4-16.[8] Northern sought payment for these liquidated amounts plus 18 percent interest and pleaded such amounts plus 18 percent interest in its complaint.[9] That certain offsets were awarded to Scovill for overcharges or cover damages did not render the amounts unliquidated.[10] If "the gross amount owing from defendant to plaintiff was ascertained and the substantive dispute revolved around credits chargeable against this amount, the amount of the bill is a liquidated sum. Interest on such a sum is collectible from its due date."[11] Accordingly, the trial court

---

[5] (Punctuation omitted.) *Contract Sales &c. v. American Express &c.*, 216 Ga. App. 61 (453 SE2d 62) (1994) (citing OCGA § 11-2-607 (1)).

[6] This does not prohibit Scovill from collecting proven damages incurred as a result of the late deliveries.

[7] (Emphasis in original; punctuation omitted.) Id. at 62.

[8] See id.; *Trebor Corp. v. Nutmeg Indus.*, 208 Ga. App. 697, 698 (1) (431 SE2d 402) (1993).

[9] Despite Scovill's argument otherwise, the case before us is factually distinct from *Gold Kist Peanuts v. Alberson*, 178 Ga. App. 253, 256 (2) (342 SE2d 694) (1986), which held that pre-judgment interest was unavailable under OCGA § 7-4-16 based on the facts that "the contract itself specified no rate of interest, and, [the] complaint merely prayed for 'interest' without specifying the rate thereof"). Compare also *Prince v. Lee Roofing Co.*, 161 Ga. App. 181, 183 (3) (288 SE2d 135) (1982) (18% interest on a commercial account unavailable where the "plaintiff at no time prior to trial indicated an intention to seek 18% interest").

[10] See *Gold Kist Peanuts*, 178 Ga. App. at 255 (2) ("That [defendant] claimed a credit against the undisputed specific amount that [plaintiff] claimed he was fully owed under the executed contract would not render his claim unliquidated. The credit only reduced the net balance on the liquidated claim; it would not render the claim unliquidated.") (citation and punctuation omitted).

[11] (Citation and punctuation omitted.) *Jordan Bridge Co. v. I.S. Bailey, Jr., Inc.*, 164 Ga.

did not err in awarding pre-judgment interest to Northern.

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Adams, J., concur.*

DECIDED MARCH 29, 2010.

*Smith, Gambrell & Russell, Rachel K. Powell, John G. Despriet,* for appellant.

*Scott M. Herrmann,* for appellee.

---

App. 124, 125 (4) (296 SE2d 107) (1982).