752 S.E.2d 586

STATE of West Virginia ex rel. U–HAUL CO. OF WEST VIRGINIA, A West Virginia Corporation, Petitioner

v.

The Honorable Paul ZAKAIB, Jr., Amanda Ferrell, John Stigall, and Misty Evans, Respondents

No. 13–0181.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 2013.

Decided Nov. 26, 2013.

Concurring Opinion of Justice Workman Dec. 3, 2013.

Charles M. Love, III, Esq., Ronda L. Harvey, Esq., Floyd E. Boone, Jr., Esq., James E. Scott, Esq., Bowles Rice LLP, Charleston, West Virginia, for the Petitioner.

Anthony J. Majestro, Esq., Powell & Majestro, PLLC, Charleston, West Virginia, James C. Peterson, Esq., Aaron L. Harrah, Esq., Hill, Peterson, Carper, Bee & Deitzler, PLLC, Charleston, West Virginia, for the Respondents.

DAVIS, Justice:

This case involves the common law doctrine of contracts known as "incorporation by reference." The parties entered into an agreement with two writings drafted by the defendant below, U–Haul of West Virginia ("U–Haul"). The first writing was titled "Rental Contract" and was signed by the three plaintiffs. The second writing, which U–Haul attempted to incorporate by reference into the signed Rental Contracts, was titled "Rental Contract Addendum" ("Addendum") and was not signed. The U–Haul Rental Contract states that the plaintiffs agreed to the terms of the Addendum. The Addendum was not made available to U–Haul customers prior to their execution of the Rental Contract and contained, *inter alia*, a provision requiring that any disputes between the parties be arbitrated.

U–Haul invokes this Court's original jurisdiction seeking a writ of prohibition and asks that we set aside a circuit court order refusing to compel the three plaintiffs who signed

Rental Contracts to participate in arbitration. U–Haul contends that the circuit court erred in finding that the Addendum was not incorporated by reference into the signed Rental Contracts. Because we find no error in the circuit court's conclusion, we deny the requested writ of prohibition.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Defendant U–Haul leases trucks and trailers to its customers for short-term use to transport cargo. U–Haul directly owns and operates six rental centers in West Virginia, and also relies upon a network of independent dealers throughout the State. U–Haul's moving equipment is sometimes used to transport cargo long distances, including across state lines.

On numerous occasions, the three individual plaintiffs (Amanda Ferrell, John Stigall, and Misty Evans) separately rented equipment that belonged to U–Haul. The record indicates that, before filing their lawsuit, Plaintiff Ferrell had signed a Rental Contract with U–Haul on at least four separate occasions; Plaintiff Stigall eleven times; and Plaintiff Evans twice.[1] Some of the rentals occurred at U–Haul–owned rental centers, others at independent dealer locations. The plaintiffs allege that they were quoted a particular price for a rental. However, the plaintiffs allege that on three specific occasions, U–Haul improperly and surreptitiously added either a $1.00, a $3.00, or a $5.00 "environmental charge" to the final price of their rentals.[2]

On August 19, 2011, the plaintiffs filed a lawsuit in the Circuit Court of Kanawha County against U–Haul asserting that the inclusion of the environmental charge constituted a breach of contract; was false advertising in violation of W. Va.Code § 32A–1–2 (1974) (Repl.Vol.2011); amounted to fraud; and violated the West Virginia Consumer Credit and Protection Act, W. Va.Code § 46A–1–101 *et seq.* The plaintiffs contended that U–Haul likewise fraudulently overcharged other West Virginia citizens and asked the circuit court to certify a class action.

Defendant U–Haul responded by filing a motion asking the circuit court to compel the plaintiffs to resolve their claims in arbitration. U–Haul contended that each time a customer rents equipment from U–Haul, the customer enters into an agreement comprised of two documents: (1) a one-page, signed Rental Contract and (2) an Addendum. The Addendum contains a provision stating that U–Haul and the customer agree to submit all disputes to binding arbitration. U–Haul contends the plaintiffs formed an agreement with U–Haul making them subject to this arbitration provision.

The record indicates that U–Haul customers entered into these agreements either on paper or electronically. At locations owned by independent dealers, customers would be presented with only a one-page pre-printed Rental Contract; customers were not initially shown the Addendum. Customers would sign the Rental Contract below a line that essentially said, "I acknowledge that I have received and agree to the terms and conditions of this Rental Contract and the Rental Contract Addendum." [3]

1. An affidavit in the record indicates that:

 19. Based upon U–Haul's computerized system, Plaintiff Stigall executed Rental Contracts with U–Haul of WV on March 4, 2006, March 31, 2006, April 8, 2006, July 28, 2007, December 31, 2008, January 3, 2009, August 7, 2009, September 5, 2009, April 23, 2010, April 24, 2010, and May 1, 2010. The contracts of July 28, 2007 and April 24, 2010, however, were subsequently cancelled.

 20. Based upon U–Haul's computerized system, Plaintiff Ferrell executed Rental Contracts with U–Haul of WV on March 24, 2007, June 30, 2007, April 26, 2009, and November 12, 2009.

 21. Based upon U–Haul's computerized system, Plaintiff Evans executed Rental Contracts with U–Haul of WV on March 2, 2010 and June 25, 2011.

2. Plaintiff Stigall alleges that a $5.00 environmental fee was added to one of his bills. Plaintiff Ferrell alleges that a $3.00 environmental fee was added to one of her bills. And Plaintiff Evans alleges that a $1.00 environmental fee was added to one of her bills.

3. With regard to this statement, the circuit court found that:

 Each of the plaintiffs has filed an affidavit stating that the RCA [Addendum] was not pro-

At locations owned by U–Haul, interactive electronic terminals were used to show terms of the Rental Contract to customers; the terminals did not display any terms of the Addendum. The terms of the Rental Contract would appear on successive screen pages, and before the customer could view a subsequent screen's rental terms, the customer would have to click a button marked "Accept" on the terminal at the bottom of the screen. None of the screens mentioned the arbitration clause at issue. After several screens had been displayed, the customer would reach a final screen that said, "By clicking Accept, I agree to the terms and conditions of this Rental Contract and Rental Contract Addendum." The customer would then have to sign their name on the screen with a stylus and click another button marked "Accept." If the customer clicked "Accept," a paper copy of the Rental Contract would then be printed by a U–Haul employee.

U–Haul asserts that it is its "unvarying and routine business practice" that every employee or independent dealer require every customer to agree to the terms of the Rental Contract before any rental equipment is provided. The plaintiffs, however, contend that while they may have signed the Rental Contract (on paper or on an electronic terminal), they did not agree to the terms of the Addendum, in part, because of the way U–Haul gives the Addendum to customers.

The Addendum is a multicolor pamphlet made of rectangular cardstock, but folded into five sections and shaped like an envelope or narrow folder. One of the apparent outside panels of the pamphlet has the title, "RENTAL CONTRACT ADDENDUM," with the next line saying, "DOCUMENT HOLDER." Below that are a few lines in smaller text stating, "Additional Terms and Conditions for EQUIPMENT Rental, Place Rental Contract documents in this folder & keep available throughout your move." Following this text is a colored block with giant text stating, "RETURNING EQUIPMENT." The remainder of the outside of the pamphlet contains detailed instructions for returning rental equipment. The other easily visible outside panels of the Addendum have advertisements for additional services offered by U–Haul, such as storage rooms. The Addendum must be opened to reveal the arbitration clause contained inside.

The plaintiffs contend that, after a Rental Contract is signed by a customer, the paper copy of the Rental Contract (whether a pre-printed form or generated using the electronic terminals) is folded in thirds like a letter by a U–Haul employee or independent dealer. The Rental Contract is then slipped inside of the folder-shaped Addendum and both are handed to the customer either before or at the same time keys are provided for the rental equipment.

The circuit court received evidence and affidavits from the parties and conducted a hearing. U–Haul argued that the doctrine of incorporation by reference allowed it to enforce the arbitration provision. The plaintiffs, however, argued that the arbitration provision in the Addendum was not mutually agreed to by the parties, since nothing in the language of the Rental Contract, or in the way that U–Haul gives the Addendum to its customers, was sufficient to inform the plaintiffs of the existence of the arbitration clause inside of the Addendum.

On March 27, 2012, the circuit court entered an order denying U–Haul's motion to compel arbitration finding that the parties never mutually agreed to arbitrate their disputes. The circuit court determined that the arbitration provision was a material term of the contract which was presented to the plaintiffs only after the contract had been signed. The circuit court specifically found that the arbitration provision had never previously been communicated to the plaintiffs. Because the plaintiffs never accepted the terms of the arbitration provision, the circuit

vided to them prior to signing the RC [Rental Contract]. U–Haul has not contested these affidavits. Indeed, its affidavits seemingly confirm the plaintiffs' testimony by stating that the "routine business practice" of U–Haul was to provide the [Addendum] to customers only

"prior to receiving possession of any rental property. . . ." Based upon the record herein, the Court finds that the [Addendum] was not provided to the plaintiffs prior to their signing the rental agreement.

court concluded that no contract to arbitrate was ever formed between the parties. U–Haul subsequently filed a "Motion to Reconsider" the circuit court's order and submitted additional affidavits and evidence for the court to review.[4] The circuit court denied the motion to reconsider on January 16, 2013.

On February 26, 2013, U–Haul filed a petition with this Court seeking a writ of prohibition to halt enforcement of the circuit court's March 27, 2012, and January 16, 2013, orders. U–Haul asks this Court to declare that the Addendum became a part of each plaintiff's Rental Contract and to direct the circuit court to refer the plaintiffs' claims to an arbitrator. We issued a rule to show cause, and we now deny the requested writ.

## II.

## STANDARD OF REVIEW

■ We have established that "[a] petition for a writ of prohibition is an appropriate method to obtain review by this Court of a circuit court's decision to deny or compel arbitration." *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W.Va. 486, 492, 729 S.E.2d 808, 814 (2012) (footnote omitted). As it is an extraordinary remedy, "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." Syl. pt. 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953).

■ In cases where a trial court is alleged to have exceeded its authority, we apply the following standard of review:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996). With the foregoing standards as our foundation, we now consider the merits of U–Haul's request for a writ of prohibition.

## III.

## DISCUSSION

■ In its effort to persuade this Court to issue the requested writ of prohibition, U–Haul argues that a single contract may be comprised of separate documents; therefore, U–Haul contends, the circuit court erred in

---

4. In this matter, U–Haul argues that the circuit court used the wrong standard to review its motion for reconsideration. The circuit court's order indicates that it reviewed the motion for reconsideration as though it was a motion filed under Rule 54(b) of the West Virginia Rules of Civil Procedure. The order then purported to set out a standard for reviewing the motion. We agree with U–Haul that its motion for reconsideration was not filed under Rule 54(b) because that Rule does not empower a party to file a motion under it. Even so, we find the circuit court applied the correct standard to review the motion. The order clearly stated that the circuit court was reviewing the motion to determine whether "justice require[d]" amending the earlier order. This is a correct statement of the appropriate standard. *See Hubbard v. State Farm Indem. Co.*, 213 W.Va. 542, 551, 584 S.E.2d 176, 185 (2003) (" 'Interlocutory orders and judgments are not within the provisions of 60(b), but are left to the plenary power of the court that rendered them to afford such relief from them as *justice requires.*' ") (quoting *Caldwell v. Caldwell*, 177 W.Va. 61, 63, 350 S.E.2d 688, 690 (1986) (emphasis added; additional quotations & citation omitted)).

refusing to acknowledge that the Addendum (containing the arbitration clause) and the Rental Contract formed the parties' entire agreement. This argument involves a fundamental question of contract law that has never been thoroughly addressed in our cases: the doctrine of incorporation by reference.

In furtherance of its argument, U–Haul asserts that the circuit court erred in holding that the Addendum was a failed attempt to modify the pre-existing Rental Contract. U–Haul contends, rather, that the agreement between the parties consisted of two documents: (1) the Rental Contract and (2) the Addendum (which contains the arbitration provision). Further, U–Haul asserts that the evidence shows that each plaintiff signed either a pre-printed paper Rental Contract or a screen on an electronic terminal that contained a sentence above the signature line that stated essentially that the plaintiff "received and agree[d] to the terms and conditions of this Rental Contract and the Rental Contract Addendum." Accordingly, U–Haul takes the position that the Addendum (and the arbitration provision contained therein) was incorporated into the Rental Contract by reference.

■ The plaintiffs counter that parties are bound to arbitrate only those issues that by clear and unmistakable writing they have agreed to arbitrate. An agreement to arbitrate will not be extended by construction or implication. The plaintiffs note that while the sentence relied upon by U–Haul says the plaintiffs have "received" the Addendum, the evidence showed it was U–Haul's policy to provide the Addendum to customers only after they had signed the Rental Contract. Furthermore, the plaintiffs contend that the Addendum is not clearly and unmistakably a written agreement to arbitrate but rather appears to be a document holder with instructions and advertising. The plaintiffs argue that the circuit court correctly found that nothing on the Addendum folder alerts U–Haul customers to the nature of the obligations contained inside. Hence, the plaintiffs take the position that the Addendum was not incorporated into the Rental Contract.

■ Arbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate. "Under the Federal Arbitration Act, 9 U.S.C. § 2, parties are only bound to arbitrate those issues that by clear and unmistakable writing they have agreed to arbitrate. An agreement to arbitrate will not be extended by construction or implication." Syl. pt. 10, *Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 724 S.E.2d 250 (2011) ("*Brown I*"), *overruled on other grounds by Marmet Health Care Ctr., Inc. v. Brown*, —— U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012) (per curiam).

> The reason for this requirement, quite simply, is that by agreeing to arbitrate a party waives in large part many of his normal rights under the procedural and substantive law of the State, and it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent[.]

*In re Marlene Indus. Corp.*, 45 N.Y.2d 327, 333–34, 408 N.Y.S.2d 410, 380 N.E.2d 239, 242 (1978). Importantly, "[n]othing in the Federal Arbitration Act ... overrides normal rules of contract interpretation." Syl. pt. 9, in part, *Brown I*, 228 W.Va. 646, 724 S.E.2d 250. Rather, the purpose of the Act "is for courts to treat arbitration agreements like any other contract. The Act does not favor or elevate arbitration agreements to a level of importance above all other contracts; it simply ensures that private agreements to arbitrate are enforced according to their terms." Syl. pt. 7, in part, *id.*

■ "Thus, to be valid, an arbitration agreement must conform to the rules governing contracts, generally.... [T]he subject Arbitration Agreement must have (1) competent parties; (2) legal subject matter; (3) valuable consideration; *and* (4) mutual assent.... Absent any one of these elements, the Arbitration Agreement is invalid." *State ex rel. AMFM, LLC v. King*, 230 W.Va. 471, 478, 740 S.E.2d 66, 73 (2013) (internal citation omitted).

■ In the instant case, some of the contracts at issue were pre-printed forms, while others were presented to customers and signed using an electronic terminal. With

the rise of internet commerce and electronic recordkeeping over the last two decades, courts have grappled with electronic forms of transactions where novel methods have been used to form contracts. These *new* contract formats—variously called "shrinkwrap," [5] "clickwrap," [6] or "browsewrap" [7] agreements—have terms that are often "not fully revealed to the buyer until after the transaction is complete." David R. Collins, *Shrinkwrap, Clickwrap, and Other Software License Agreements: Litigating a Digital Pig in a Poke in West Virginia*, 111 W. Va. L.Rev. 531, 533 (2009). *See also* Paul J. Morrow, *Cyberlaw: The Unconscionability/Unenforceability of Contracts (Shrink–Wrap, Clickwrap, and Browse–Wrap) on the Internet: A Multijurisdictional Analysis Showing the Need for Oversight*, 11 U. Pitt. J. Tech. L & Pol'y 7, —— (2011) ("These agreements are not communicated, definitive, or the product of negotiation. Thus, this is the quandary and perplexity of holding shrink-wrap/clickrap agreements enforceable when they are not valid contracts.").

 A "clickwrap" or "click-through" agreement usually "appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa. 2007). *See also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 (2d Cir.

2002) (discussing "clickwrap" agreements); Kevin W. Grierson, *Enforceability of "Clickwrap" or "Shrinkwrap" Agreements Common in Computer Software, Hardware, and Internet Transactions*, 106 A.L.R. 5th 309 (2004) (same). To form such an agreement, "users typically click an 'I agree' box after being presented with a list of terms and conditions of use." *Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 366 (E.D.N.Y.2009).

 U–Haul concedes that the agreements formed with customers using its electronic terminals bear some resemblance to clickwrap agreements, the one difference being that they were not executed over the internet. Regardless of the technology platform employed, we find the agreements herein to be in the nature of clickwrap agreements. Moreover, from a legal standpoint, electronic contracting is no different from contracting using tangible paper writings. "[A] contract cannot be denied enforcement solely because it is in electronic form or signed electronically." Juliet M. Moringiello and William L. Reynolds, *From Lord Coke to Internet Privacy: The Past, Present, and Future of the Law of Electronic Contracting*, 72 Md. L.Rev. 452, 460 (2013). *See also* Nathan J. Davis, *Presumed Assent: The Judicial Acceptance of Clickwrap*, 22 Berkeley Tech. L.J. 577, 579 (2007) ("[C]ourts have unanimously found that clicking is a valid way to manifest assent since the first clickwrap agreement was litigated in 1998." (foot-

---

**5.** The prototypical example of a "shrinkwrap" agreement is a one-page writing inside transparent plastic wrapped around a product (often computer software) that can be read by a purchaser before tearing open the plastic wrap. The writing typically states that, if the purchaser opens the shrinkwrap packaging and uses the product inside, then the purchaser is agreeing to a contract drafted by the seller. The writing intends to convey that that, "by opening the plastic wrap and actually using the [product], customers will bind themselves to the terms of the shrinkwrap license." Mark A. Lemley, *Intellectual Property and Shrinkwrap Licenses*, 68 S. Cal. L.Rev. 1239, 1241–42 (1995).

**6.** The agreement at issue herein is in the nature of a "clickwrap" agreement. This type of agreement will be explained more fully *infra*.

**7.** An internet website owner may attempt to form a "browsewrap" agreement with a customer by posting terms and conditions that typically can

only be accessed through a hyperlink at the bottom of the screen. *See generally Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 366 (E.D.N.Y.2009). Unlike a clickwrap agreement, a browsewrap agreement "does not require the user to manifest assent to the terms and conditions expressly.... A party instead gives his assent simply by using the website." *Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06–CV–0891–B, 2007 WL 4823761, at *4 (N.D.Tex. Sept. 12, 2007). See also, Ian Rambarran and Robert Hunt, *Are Browse–Wrap Agreements All They Are Wrapped Up to Be?*, 9 Tul. J. Tech. & Intell. Prop. 173, 174 (2007) ("A click-through agreement is usually conspicuously presented to an offeree and requires that person to click on an acceptance icon, which evidences a manifestation of assent to be bound to the terms of a contract. On the other hand, a browse-wrap agreement is typically presented at the bottom of the Web site where acceptance is based on 'use' of the site.").

note omitted)).[8] An agreement where the terms are presented in an electronic form, or one that is signed electronically, is therefore interpreted and applied using the same common law rules that have been applied for hundreds of years to oral and written agreements.[9]

■ At common law, parties may incorporate into their contract the terms of some other writing. As the treatise *Williston on Contracts* makes clear, "[g]enerally, all writings which are part of the same transaction are interpreted together." 11 Richard A. Lord, *Williston on Contracts* § 30:25, at 295 (4th ed.2011) (footnote omitted). "When a writing refers to another document, that other document ... becomes constructively a part of the writing, and in that respect the two form a single instrument." *Id.* at 304. "Whether two writings are to be construed as a single contract, however, depends on the intent of the parties." *Van Orman v. American Ins. Co.*, 680 F.2d 301, 306 (3d Cir.1982).

■ The *Williston* treatise makes clear, however, that a mere reference in a writing to another document is not always sufficient to incorporate into the writing the referenced document. To achieve incorporation of a referenced document, a writing must make a "clear reference to the document" and "describe[ ] it in such terms that its identity may be ascertained beyond doubt[.]" 11 *Williston on Contracts* § 30:25, at 296. Conversely, "incorporation by reference is ineffective to accomplish its intended purpose when the provisions to which reference is made do not have a reasonably clear and ascertainable meaning." *Id.* at 302 (footnote omitted). *See also, Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.2013) ("Plainly referring to a document requires more than merely mentioning the document.... The language in the signed document must show the parties intended for the other document to become part of the agreement." (citations omitted)). An oblique reference to a separate, non-contemporaneous document is insufficient to incorporate the document into the parties' final contract. *Shark Info. Servs. Corp. v. Crum & Forster Commercial Ins.*, 222 A.D.2d 251, 252, 634 N.Y.S.2d 700, 701 (1995) ("Incorporation by reference, of course, is appropriate only where the document to be incorporated is referred to and described in the instrument as issued so as to identify the referenced document 'beyond all reasonable doubt.'... It is clear that none of the instant policy's oblique references to an otherwise unidentified 'Coverage Form' meet this exacting standard." (citations omitted)). Further, "in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms[.]" 11 *Williston on Contracts* § 30:25, at 302–03 (footnote omitted). *See also* 17A C.J.S. *Contracts* § 402, at 294–95 ("For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms. A reference to another document must be clear and unequivocal, and the terms

---

**8.** West Virginia has adopted the Uniform Electronic Transactions Act, W. Va.Code § 39A–1–1 *et seq.*, to facilitate the continued use and development of electronic transactions. The Act specifically states that a "record or signature may not be denied legal effect or enforceability *solely* because it is in electronic form," and a "contract may not be denied legal effect or enforceability *solely* because an electronic record was used in its formation." W. Va.Code §§ 39A–1–7(a) & (b) (2001) (Repl.Vol.2010) (emphases added).

**9.** The problems raised by electronic commerce and the formation of contracts is a problem likely to increase in future years. As one commentator has said,

> Consumers making purchases on the Internet are well practiced at scrolling through and "agreeing" to "Terms and Conditions" with extraordinary speed and extraordinarily little thought. These terms frequently include an arbitration provision that deprives the consumer of the right to sue if a dispute arises. The combination of a significant contract provision with a particularly problematic method of contract formation raises serious problems for consumers and for contract law. These problems are exacerbated by the increasing likelihood that the consumer will be viewing and agreeing to on-line contract terms not through the large screen of a desktop computer, but rather through the tiny screen of a cell phone or similar device.

Stephen E. Friedman, *Protecting Consumers from Arbitration Provisions in Cyberspace, the Federal Arbitration Act and E–Sign Notwithstanding*, 57 Cath. U.L.Rev. 377, 378 (2008).

of the incorporated document must be known or easily available to the parties.... However, a mere reference to another document is not sufficient to incorporate that other document into a contract; the writing to which reference is made must be described in such terms that its identity may be ascertained beyond reasonable doubt." (footnotes omitted)); Stuart M. Boyarsky, *Deference to A Reference: Incorporating Arbitration Where It Ought Not Be*, 11 Fla. Coastal L.Rev. 387, 405 (2010) ("[I]ncorporation by reference of an arbitration agreement is permitted when: (1) the underlying contract clearly references a separate document, (2) the identity of the separate document is ascertainable, and (3) the incorporation of the arbitration clause can be foreseen and will not result in hardship." (footnote omitted)).

This Court has recognized that separate writings, including agreements to arbitrate, may be incorporated by reference into a contract.[10] However, there are no cases in West Virginia discussing what is required for a document to be properly incorporated into a contract by reference.[11] Other courts, however, have addressed the issue in detail.

■■ A majority of courts hold that for the terms of one document to be incorporated by reference into a writing executed by the parties, "the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto[.]" *Scott's Valley Fruit Exch. v. Growers Refrigeration Co., Inc.*, 81 Cal.App.2d 437, 447, 184 P.2d 183, 189 (1947).[12] Additionally, courts generally "al-

**10.** *See, e.g.*, Syl. pt. 2, *Rashid v. Schenck Constr. Co., Inc.*, 190 W.Va. 363, 438 S.E.2d 543 (1993) ("Under the Federal Arbitration Act, an arbitration agreement can be incorporated into a subcontract by reference in a general contract. Likewise, an agreement to arbitrate, when it is a part of a general contract, can be incorporated into a bond, by reference, to the general contract."); *Art's Flower Shop, Inc. v. Chesapeake & Potomac Tel. Co. of West Virginia, Inc.*, 186 W.Va. 613, 616, 413 S.E.2d 670, 673 (1991) ("Nothing in West Virginia statutes or case law precludes incorporation of prior contract provisions by reference to an earlier contract."); *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 469, 223 S.E.2d 433, 437 (1976) ("It is a well-recognized principle of law that, even though writings may be separate, they will be construed together and considered to constitute one transaction when the parties are the same, the subject matter is the same and the relationship between the documents is clearly apparent.").

**11.** As the United States Court of Appeals for the Fourth Circuit recently noted, West Virginia "has not, as far as we can tell, articulated the requirements for effective incorporation by reference." *Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC*, 514 Fed.Appx. 365, 367 (4th Cir.2013).

**12.** *Accord One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 268 (5th Cir.2011) ("Terms incorporated by reference will be valid so long as it is 'clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'... Notice of incorporated terms is reasonable where, under the particular facts of the case, '[a] reasonably prudent person should have seen' them." (internal citations omitted)); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996) (recognizing that the common law requires the parties to have had knowl-

edge of and assented to the incorporated terms, also requiring that the incorporated document be referred to and described sufficiently so that it may be identified beyond all reasonable doubt); *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir.1995) ("In order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms."); *Hertz Corp. v. Zurich Am. Ins. Co.*, 496 F.Supp.2d 668, 675 (E.D.Va.2007) (recognizing that "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms," stating that the identity of the secondary document must be readily ascertainable, and holding that "it cannot be said that the parties had agreed on the terms of a rental agreement at the time" (internal quotations and citation omitted)); *United States v. Agnello*, 344 F.Supp.2d. 360, 369 n. 6 (E.D.N.Y.2004) (requiring that it "be clear that the parties to the agreement had knowledge of and assented to the incorporated terms" (quotations and citation omitted)); *Ingersoll–Rand Co. v. El Dorado Chem. Co.*, 373 Ark. 226, 233, 283 S.W.3d 191, 196 (2008) (stating that the incorporated document "must be described in such terms that its identity maybe ascertained beyond reasonable doubt.... Furthermore, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms" (internal quotations and citations omitted)); *Taubman Cherry Creek Shopping Ctr., LLC v. Neiman–Marcus Grp., Inc.*, 251 P.3d 1091, 1095 (Colo.Ct.App.2010) ("Pursuant to general contract law, for an incorporation by reference to be effective, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" (citation omitted)); *Housing Auth. of Hartford v. McKenzie*, 36 Conn.Supp. 515, 518–19, 412 A.2d 1143, 1145 (1979) ("The critical concern in determining the validity of the terms of a document incor-

low an unsigned document to be incorporated into a signed document as long as the signed paper specifically refers to the unsigned document and the unsigned document is available to the parties." National Consumer Law Center, *Consumer Arbitration Agreements*, § 5.2.2.5, at 112 (6th ed.2011) (footnote omitted).[13] In other words, "[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir.2003) (footnote omitted).

 "In order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir.1995). "While a party's failure to read a duly incorporated document will not excuse the obligation to be bound by its terms ... a party will not be bound to the terms of any document unless it is clearly identified in the agreement." *PaineWebber*

*Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (citations omitted).[14]

One scholar has suggested that incorporation by reference in drafting contracts can be problematic and "can create inconsistency or ambiguity that one would expect would not arise were the pertinent provisions more expressly detailed in a single writing[.]" Royce de R. Barondes, *Side Letters, Incorporation by Reference and Construction of Contractual Relationships Memorialized in Multiple Writings*, 64 Baylor L.Rev. 651, 661 (2012). "[T]he cavalier drafting style, simply incorporating another document by reference, allows parties to elide the process of detailing precisely what they intended, creating ambiguity that may, or may not, be properly resolved in subsequent litigation." *Id.* at 663 (footnote omitted). Furthermore, attempts at incorporation by reference are sometimes used to "create contract forms in a way designed to mislead" and "may be used by a party to obtain the other's unknowing assent to onerous provisions." *Id.* at 665. "[T]his type of scheme long predated the internet. Judicial principles restricting this sharp dealing are also longstanding." *Id.* (footnote omitted).

porated by reference is whether the contracting parties knew of and assented to the additional provisions. The meeting of the minds and mutuality of assent are the most basic ingredients of a contract. Hence, the courts, while willing to enforce the incorporated terms, will do so only when the whole writing and the circumstances surrounding its making evidence the parties' knowledge of and assent to each term."); *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J.Super. 510, 533, 983 A.2d 604, 617 (N.J.Super.Ct.App.Div.2009) ("In order for there to be a proper and enforceable incorporation by reference of a separate document, the document to be incorporated must be described in such terms that its identity may be ascertained beyond doubt and the party to be bound by the terms must have had 'knowledge of and assented to the incorporated terms.' "); *Western Washington Corp. of Seventh–Day Adventists v. Ferrellgas, Inc.*, 102 Wash.App. 488, 7 P.3d 861 (2000) (quoting Williston and finding extrinsic evidence indicated that one of the parties was aware of the incorporated terms prior to signing the agreement).

**13.** Some courts

are careful not to enforce arbitration clauses [incorporated by reference] ... unless the incorporated document is delivered to the consumer. For example, a North Carolina appel-

late court held that an account holder was not bound by an arbitration clause in a bank services agreement, even though he had executed a signature card that incorporated the agreement by reference, when the bank had not delivered a copy of the bank services agreement to him until after he commenced litigation and he was unaware of the arbitration clause.

National Consumer Law Center, *Consumer Arbitration Agreements*, § 5.2.2.5, at 112 (6th ed.2011) (footnote omitted) (citing *Kennedy v. Branch Banking & Trust Co.*, 165 N.C.App. 275, 600 S.E.2d 520 (2004) (unpublished table dec.; full text reported at 2004 WL 1491197)).

**14.** A commonly cited example of poor identification of a document sought to be incorporated into a writing is *Weiner v. Mercury Artists Corp.*, 284 A.D. 108, 130 N.Y.S.2d 570 (1954). In *Weiner*, a seller tried to incorporate a 207–page booklet into a one-page contract by reference, and then later tried to avail itself of a "vague provision for arbitration" buried somewhere between pages 62 and 66 of the booklet. *Id.* at 109, 130 N.Y.S.2d at 571. Because there had been no other mention of arbitration, the court found that the arbitration clause was not properly incorporated by reference into the parties' contract.

After considering these authorities, we hold that, in the law of contracts, parties may incorporate by reference separate writings together into one agreement. However, a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement. To uphold the validity of terms in a document incorporated by reference, (1) the writing must make a clear reference to the other document so that the parties' assent to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship.

Applying the foregoing holding to the facts of the case *sub judice*, we conclude that the circuit court correctly found that U–Haul was unsuccessful in its attempts to incorporate the Addendum into the Rental Contract. Both U–Haul's pre-printed Rental Contracts and electronic contracts succinctly referenced the Addendum. However, such a brief mention of the other document simply is not a sufficient reference to the Addendum to fulfill the proper standard. The reference to the Addendum is quite general with no detail provided to ensure that U–Haul's customers were aware of the Addendum and its terms, including its inclusion of an arbitration agreement. The lack of a detailed description is compounded by the fact that the Addendum itself was designed to look more like a document folder advertising U–Haul products, services, and drop-off procedures, rather than a legally binding contractual agreement. Finally, and most troubling to this Court, is the fact that U–Haul's practice was to provide customers a copy of the Addendum *only after* the Rental Agreement had been executed. Under these circumstances, there simply is no basis upon which to conclude that a U–Haul customer executing the Rental Agreement possessed the requisite knowledge of the contents of the Addendum to establish the customer's consent to be bound by its terms, which terms include the arbitration agreement sought to be enforced by U–Haul in this case.[15]

## IV.

## CONCLUSION

Because we find that the circuit court was correct in finding that the Addendum was not incorporated by reference into the U–Haul Rental Agreement executed by the plaintiffs, we further conclude that the circuit court properly refused to enforce the arbitration agreement included within that Addendum. Accordingly, we deny the requested writ of prohibition.

Writ Denied.

Justice KETCHUM dissents and reserves the right to file a dissenting opinion.

**15.** U–Haul has asserted an additional argument that the plaintiffs and circuit court violated a rule implied by the Federal Arbitration Act known as the "doctrine of severability." We disagree. In Syllabus point 4 of *State ex rel. Richmond American Homes of West Virginia, Inc. v. Sanders*, 228 W.Va. 125, 717 S.E.2d 909 (2011), this Court held that,

> [u]nder the Federal Arbitration Act, 9 U.S.C. § 2, and the doctrine of severability, only if a party to a contract explicitly challenges the enforceability of an arbitration clause within the contract, as opposed to generally challenging the contract as a whole, is a trial court permitted to consider the challenge to the arbitration clause. However, the trial court may rely on general principles of state contract law in determining the enforceability of the arbitration clause. If necessary, the trial court may consider the context of the arbitration clause within the four corners of the contract, or

consider any extrinsic evidence detailing the formation and use of the contract.

In this case, U–Haul sought to enforce an arbitration provision contained within the Addendum. The plaintiffs specifically challenged the enforceability of the Addendum by showing that the arbitration provision was never communicated to them. Additionally, the plaintiffs argued to the circuit court that the entire Addendum—including the arbitration provision—was never presented to them as part of the overall agreement of the parties, and, therefore, they never agreed to any of the terms in the Addendum. While there are other provisions in the Addendum, the plaintiffs did not challenge those provisions. The circuit court's analysis specifically centered on whether the parties mutually agreed to arbitrate their disputes. Thus, we find that the circuit court properly applied the doctrine of severability, and we find no error with this ruling.

Justice KETCHUM, dissenting:

I respectfully dissent. The majority opinion, although well reasoned, fails to consider several West Virginia statutes which would have led to a different outcome in this case. A fair reading of these statutes requires that the plaintiffs' lawsuit be resolved in arbitration.

These statutes, which were not applied by the circuit court, are in Article 2A of the Uniform Commercial Code ("the UCC"), titled the "Uniform Commercial Code—Leases." [1] This article of the Uniform Commercial Code "applies to any transaction, regardless of form, that creates a lease." [2] By "lease," the Legislature meant "a transfer of the right to possession and use of goods for a term in return for consideration." [3]

The plaintiffs' rental of U–Haul's equipment was a "lease" governed by Article 2A of the UCC. The terms of the lease agreement between the plaintiffs and U–Haul should, therefore, have been addressed by the parties and the circuit court under Article 2A. The UCC states that a "lease agreement" has the following meaning (with emphasis added):

> "Lease agreement" means the bargain, with respect to the lease, of the lessor and the lessee in fact as found in their language or *by implication from other circumstances including course of dealing* or usage of trade or course of performance as provided in this article.... [4]

Plainly, the Legislature intended that a lease agreement may include not just the explicit terms of the writing signed by the parties, but also includes the parties' "course of deal-ing," that is, the sequence of conduct between the parties previous to the agreement. The parties' course of dealing may be regarded as establishing a common basis of understanding for interpreting the lease. The UCC offers the following definition of "course of dealing":

> A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is *fairly to be regarded as establishing a common basis of understanding* for interpreting their expressions and other conduct. [5]

The circuit court in this case found that the plaintiffs were not bound by the arbitration provision in the U–Haul Addendum because the circuit court found there was *nothing* in the record to show each plaintiff had knowledge of, and assented to, U–Haul's arbitration provision when they signed the Rental Contract. The plaintiffs argue that, as a company policy, U–Haul never presented, discussed, or noted the arbitration clause to its customers before the Rental Contract was signed. The plaintiffs therefore contend that a typical U–Haul customer signing a Rental Contract would never know they had agreed to arbitrate any disputes until *after* they had reviewed and agreed to the Rental Contract. If I relied solely on this presentation of the facts by the plaintiffs, at first blush the circuit court's reasoning would seem to be sound.

But the substantial record reveals additional facts beyond those cited by the plaintiffs that the circuit court clearly did not consider, and which misinformed the circuit court's construction of the parties' agree-

1. *W.Va.Code,* § 46–2A–101 to –532.

2. *W.Va.Code,* § 46–2A–102 [1996]. The official comment to *W.Va.Code,* § 46–2A–102 says that Article 2A was designed to govern "transactions as diverse as the lease of a hand tool to an individual for a few hours and the leveraged lease of a complex line of industrial equipment to a multi-national organization for a number of years."

3. W.Va.Code, § 46–2A–103(j) [2006]. This statute was amended to make some stylistic changes in 2012, but no changes were made to subsection (j).

4. *W.Va.Code,* § 46–2A–103(k) [2006] (emphasis added). *W.Va.Code,* § 46–2A–106 [1996] imposes limitations on the applicable law and judicial forums that can be chosen by the parties to a consumer lease, but the Official Comment to the statute makes clear that "this section does not limit selection of a nonjudicial forum, such as arbitration."

5. *W.Va.Code,* § 46–1–303(b) [2006] (emphasis added).

ment. The record shows that these three plaintiffs did not make isolated, sporadic, or one-time transactions, but rather had an established "course of dealing" with U–Haul. The three plaintiffs had repeatedly signed agreements with U–Haul, and repeatedly received copies of U–Haul's Addendum. For example, one plaintiff signed Rental Contracts and received copies of the Addendum at least eleven times before filing the underlying lawsuit. Another plaintiff signed the Rental Contract and received the Addendum at least four times.[6] On this record, I cannot in good conscience countenance the circuit court's finding that the plaintiffs were oblivious to the existence, let alone the contents, of the U–Haul Addendum.

I firmly believe that "an agreement to arbitrate must be clear and direct, and must not depend upon implication, inveiglement or subtlety.... [It's] existence ... should not depend solely upon the conflicting fine print of commercial forms which cross one another but never meet."[7] But as the unique facts of this case have been presented to this Court, I believe that the circuit court exceeded its jurisdiction. The sequence of conduct concerning previous transactions between the plaintiffs and U–Haul established that the plaintiffs each received multiple copies of the Addendum and the arbitration provision. The Rental Contract makes a clear reference to the Addendum, and even if the identity of the Addendum was vague in the first transaction between the parties, the numerous subsequent transactions would have allowed the plaintiffs to ascertain the identity and contents of the Addendum beyond doubt. Their course of conduct should fairly be regarded as establishing a common basis for understanding the parties' agreement.

It was therefore inconsistent for the circuit court to find the plaintiffs had absolutely no knowledge of the Addendum's existence or the terms of the arbitration provision, without violating the fundamental rule that "[a] party to a contract has a duty to read the instrument."[8] U–Haul has, in my judgment of the record, established that the agreement with the plaintiffs fairly incorporated an arbitration provision. A writ of prohibition is therefore warranted, and the majority opinion was wrong to deny the writ.

In addition, I believe this case is significantly flawed going forward. The plaintiffs in their complaint have asked the trial court to certify a class action. Under Rule 23(a) of the *Rules of Civil Procedure*, the plaintiffs bear the burden of establishing four prerequisites: numerosity, commonality, typicality, and adequacy of representation. Based on the record submitted to this Court, I do not believe these plaintiffs are capable of showing commonality.

We defined "commonality" in Syllabus Point 11 of *In re W.Va. Rezulin Litigation*, 214 W.Va. 52, 585 S.E.2d 52 (2003):

> The "commonality" requirement of Rule 23(a)(2) of the *West Virginia Rules of Civil Procedure* [1998] requires that the party seeking class certification show that "there are questions of law or fact common to the class." A common nucleus of operative fact or law is usually enough to satisfy the commonality requirement. The threshold of "commonality" is not high, and requires only that the resolution of common questions affect all or a substantial number of the class members.

I do not see any evidence of commonality between these three plaintiffs and the members of their proposed class. Some of the

---

6. The remaining plaintiff, Ms. Evans, brought suit alleging she was defrauded out of $1.00 in a transaction with U–Haul, yet even she returned to U–Haul, signed another Rental Contract and received another copy of the Addendum two months before the underlying lawsuit was filed in circuit court. Of the three plaintiffs, only her circumstances come close to a "course of dealing" under the UCC which would negate application of the arbitration provision in the Addendum. However, in light of the way the case was structured by plaintiff's counsel, and my review of the extensive record, I believe Ms. Evans also

formed an agreement to arbitrate her disputes with U–Haul.

7. *Application of Doughboy Indus., Inc.*, 17 A.D.2d 216, 220, 233 N.Y.S.2d 488, 493 (N.Y.App.Div. 1962)

8. Syllabus Point 4, *Am. States Ins. Co. v. Surbaugh*, 231 W.Va. 288, 745 S.E.2d 179 (2013) (quoting Syllabus Point 5, *Soliva v. Shand, Morahan & Co., Inc.*, 176 W.Va. 430, 345 S.E.2d 33 (1986)).

plaintiffs or class members may have read the arbitration agreement they received, and others may not have read it. The U–Haul agent may have explained the agreement to some plaintiffs or class members but not others. Some plaintiffs or class members may have been educated and understood and accepted the arbitration process, while others may have been illiterate. Some plaintiffs or class members may have seen the arbitration clause and chosen to disregard it totally, while others may have never noticed that the Addendum contained supplemental contract terms.

In sum, I believe that these three plaintiffs present three unique, uncommon questions of law and fact. To determine the application of the arbitration clause to each plaintiff would require individualized assessment of each plaintiff's particular facts—and likewise, an individualized assessment of each potential class member's situation. Even under the majority opinion's enlightened discussion of contract law, some plaintiffs and some class members knowingly agreed to arbitration, and their cases should be heard there and not in circuit court. I therefore think that, going forward, the circuit court should give weight to the fact that these three plaintiffs cannot establish commonality under Rule 23.

Justice WORKMAN concurs and reserves the right to file a concurring opinion.

WORKMAN, J., concurring:

(Filed Dec. 3, 2013)

In this proceeding, the petitioner sought a writ of prohibition to prevent enforcement of a circuit court order that denied the petitioner's motion to compel arbitration. Justice Davis, writing for the majority, has denied the writ after determining that an arbitration agreement was not part of the contracts between the petitioner and the respondents. I concur with all of the majority's reasoning and concur in the judgment. I write separately, however, to address the dissent's position that the contracts fairly incorporated an arbitration provision because of the parties'

"course of dealing" within Article 2A of the Uniform Commercial Code, West Virginia Code §§ 46–2A–101 to –532.

To begin, it should be noted that neither the parties nor the circuit court addressed "course of dealing." The dissent raises this issue *sua sponte*, in the absence of a record properly developed for resolution of a "course of dealing" claim.

The UCC sets out a concise definition of the phrase "course of dealing" in West Virginia Code § 46–1–303(b):

A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

This definition is further explained in West Virginia Code § 46–1–303(d), which provides, in relevant part:

A ... course of dealing between the parties ... is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement.

Finally, a legislatively approved limitation upon the phrase "course of dealing" is set out in the Official Comment for the statute as follows:

2. "Course of dealing," as defined in subsection (b), is restricted, literally, to a sequence of conduct between the parties previous to the agreement. A sequence of conduct after or under the agreement, however, is a "course of performance."

W. Va.Code § 46–1–303, Official Comment No. 2 (emphasis supplied).

As is readily apparent from an examination of these provisions, the UCC allows the introduction of evidence of pre-contract "course of dealing" between the parties in order to avoid application of the parol evidence rule in a situation where there is an ambiguity in a term of the contract.[1]

---

1. "The parol evidence rule ... generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of written contracts[.]" *Larew v. Monongahela Power Co.*, 199 W.Va. 690, 694, 487 S.E.2d 348, 352 (1997); *see* Syl. Pt. 1, *Kanawha Banking and Trust Co. v.*

[The UCC] makes admissible evidence of course of dealing ... to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties ... were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used.

*Scovill Fasteners, Inc. v. Northern Metals, Inc.*, 303 Ga.App. 246, 692 S.E.2d 840, 843 (2010); *see also Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or.App. 305, 696 P.2d 1096, 1109 (1985) ("[The UCC] provides that the terms of a completely integrated document may be explained or supplemented by three different means: specifically, evidence of (1) a course of dealing, (2) a course of performance or (3) usage of the trade."); *Morgan v. Stokely–Van Camp, Inc.*, 34 Wash.App. 801, 663 P.2d 1384, 1389–1390 (1983) ("[C]ourse of dealing is used most frequently to clarify or perhaps alter the meaning of terms used in a contract.").

The petitioner in this case did not argue that pre-contract conduct between the parties explained the respondents' understanding of any term in the contracts, because the contracts did not even mention the term—an arbitration clause—at issue in this lawsuit. "[A] course of dealing ... can only give meaning to and supplement or qualify *the terms of an agreement between the parties.*" *Circle A Automotive Service, Inc. v. American Rentals, Inc.*, 2001 WL 195006, *1 n. 1 (Conn.Super.2001) (emphasis supplied). "In such instances, the evidence of a course of dealing that explains or supplements a contract is competent evidence of the parties' intent and can become a part of a contract." *L.F. Brands Marketing, Inc. v. Dillard's, Inc.*, 314 S.W.3d 736, 739 (2009).

*Gilbert*, 131 W.Va. 88, 46 S.E.2d 225 (1947) ("Extrinsic evidence of statements and declarations of the parties to an unambiguous written contract occurring contemporaneously with or prior to its execution is inadmissible to contradict, add to, detract from, vary or explain the terms of such contract, in the absence of a show-

In short, the dissent is attempting to pound a square peg into a round hole with its "course of dealing" analysis. The fact that the petitioner's prior contracts with the respondents made no mention of an arbitration clause does not establish a "course of dealing" between the parties; rather, it establishes a consistent but unilateral course of conduct on the part of the petitioner in attempting to hide the arbitration clause from its customers. To accept the dissent's position to the contrary would be to elevate the adage, "fool me once, shame on you; fool me twice, shame on me," to the status of a legal principle.

The real bottom line of the dissent's analysis seems to be the dissenting justice's belief that the respondents knew or should have known about the arbitration clause, having received copies of the Addendum after signing their previous contracts. There are two flaws in this analysis, the first a matter of evidence and the second a matter of law.

First, the record indicates that after the respondents signed their contracts, they were handed a packet of materials that included copies of the Addendum—at the same time they were handed the car keys and were on the way outside to take possession of their vehicles. There is no evidence to indicate they were told to review the contents of the packets before getting into the vehicles, and no evidence to indicate they were told that anything in the packets added additional provisions to the contracts they had just signed. On this record, no appellate court could conclude in the first instance [2] that the respondents had knowledge of the arbitration clause contained in the Addendum because they had received copies of the document after the fact, i.e., after they had signed their contracts and taken possession of their vehicles.

Second, and more fundamentally, I am unwilling to conclude as a matter of law, as the

ing of illegality, fraud, duress, mistake or insufficiency of consideration.").

**2.** Because "course of conduct" was not raised by the parties, the circuit court had no occasion to make specific findings of fact with respect to these critical facts.

dissent does in cursory fashion, that once the respondents were given those packets they had a duty to read everything contained in them. This Court has held that " '[a] party to a contract has a duty to read the instrument.' Syllabus point 5, *Soliva v. Shand, Morahan & Co., Inc.,* 176 W.Va. 430, 345 S.E.2d 33 (1986), *overruled on other grounds by National Mutual Insurance Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987)." Syl. Pt. 4, *American States Ins. Co. v. Surbaugh,* 231 W.Va. 288, 745 S.E.2d 179 (2013).[3] But in this case the contract was completely silent with respect to arbitration; rather, the arbitration clause was contained in a separate document "hiding out" in a packet of unrelated information presented to the respondents *after* they had signed their contracts. I do not believe that the principle of *Soliva* and *Surbaugh* extends to this situation, and I do not believe that the issue can or should be decided in this case where the parties did not develop the record for this purpose.

Accordingly, I concur in the majority opinion.

---

3. Ironically, the dissenting justice in this case concurred in *Surbaugh,* clarifying that one "cannot escape the effect of exclusions in an insurance policy due to failure to read the policy, when the exclusions are *clear, unambiguous and conspicuous.*" 231 W.Va. at 300, 745 S.E.2d at 191 (emphasis supplied). In the instant case, the arbitration provision at issue was not even contained in the contract; it was clearly, unambiguously and conspicuously *not there.*